# EXHIBIT A

**Mighty Argo Cable Car**
**Investor Contact List**

2.9.2021

| Subscription # | Joinder Agreement | Subscription Booklet | First Name | Last Name | Address | | Investing Account |
|---|---|---|---|---|---|---|---|
| 1 | Yes | Yes | Greg | Kreiling | 3520 Owens St Wheat Ridge CO 80033 | Individual Ownership | Gregory J. Kreiling |
| 3 | Yes | Yes | Jack (William) | Littleton | 345 Eacher Hollow Rd Horseheads, New York 14845 | Individual Ownership | William John Littleton |
| 4 | Yes | Yes | Caroline | Simpson | 168 Hoffman Ave Sagle IO 83860 | Individual Ownership | Caroline D Simpson |
| 5 | Yes | Yes | Dan | Mills | PO Box 1376 Sagle ID 83860 | Joint Tenants with Rights of Survivorship | Dan Mills Gail Mills |
| | | | Gail | Mills | PO Box 1376 Sagle ID 83860 | | |
| 6 | Yes | Yes | Charles (Chas) | Nelson | 32458 Little Cub Rd, Evergeen CO 80439 | Individual Ownership | Charles R Nelson |
| 8 | Yes | Yes | Dave | Kost | 456 Crystal Ridge Rd., Evergreen, CO 80439 | Partnership LLC | Rustic Ridge Investments, LLC |
| 9 | Yes | Yes | S. David | Dozbaba | 166 Siesta Circle Evergreen, CO 80453 | Joint Tenants with Rights of Survivorship | S. David and Pamela L, Dozbaba |
| | | | Pam | Dozbaba | 166 Siesta Circle Evergreen, CO 80453 | | |
| 10 | Yes | Yes | Timothy | Kerr | 303 and 1/2 Fanmar Way Capitola CA 95010 | Individual Ownership | |
| 11 | Yes | Yes | Ed | MacArthur | 816 Springhill Road Steamboat Springs 80487 | Trust | Charles E. MacArthur Trust |
| 12 | Yes | Yes | Roy | Cook | 4747 Research Forest Drive #180-172 The Woodlands TX 77381 | Partnership | RNC Colorado Investment LLC |
| 14 | Yes | Yes | Steve | Indrahus | 377 Dumont Lane/PO Box 66 Dumont CO 80436 | Joint Tenants with Rights of Survivorship | Steve Indrehus Maria Indrehus |
| | | | Maria | Indrahus | 377 Dumont Lane/PO Box 66 Dumont CO 80436 | | |
| 15 | Yes | Yes | Joe | Hitchcock | 2336 SE Ocean Blvd #138 Stuart FL 34996 | Individual Ownership | |
| 16 | Yes | Yes | Mourer | Blake | 14815 Foothill Road Golden CO 80401 | Limited Liability Company | Open Studio Architecture |
| 20 | Yes | Yes | David | Parker | PO Box 891 Hill City SD 57745 | Limited Liability Company | JSML, LLC |
| | | | Jennifer | Truong | 603 S Cook St Barrington IL 60010 | | |
| | | | Noyes | Combs | | | |
| | | | Mattew | Parker | | | |
| | | | Laura | Parker | | | |
| 21 | Yes | Yes | Thomas L | Burke | 308 Newman Ct, Lake Bluff, ILL, 60044 | Trust | Thomas L. Burke Trust |
| 23 | Yes | Yes | Peter Scott | Renner | 643 E Erie Street Milwaukee, WI  53202 | Individual Ownership | |
| 24 | Yes | Yes | Richard | Lowe | 31775 Bradley Ranch Rd Steamboat Springs CO 80487 | Trust | Richard B. Lowe Revocable Trust |
| 25 | Yes | Yes | Curt | Weiss | 940 Crawford Ave,PO Box 771818 Springs, CO.  80477 | Joint Tenants with Rights of Survivorship | Curtis D and Mary C Weiss |
| | | | Mary C | Weiss | 940 Crawford Ave,PO Box 771818 Springs, CO.  80477 | | |
| 30 | Yes | Yes | Thomas | Kelly | 1601 Harvard Dr Albuquerque, NM 81106 | Joint Tenants with Rights of Survivorship | Thomas Brian Kelly & Baureen Keleher Kelly |
| | | | Maureen | Kelly | 1601 Harvard Dr Albuquerque, NM 81106 | | |
| 31 | Yes | Yes | Ann | Kelly | 918 Magnolia St Denver CO 80220 | Individual Ownership | Ann M Kelly |
| 32 | Yes | Yes | Allen /Elizabeth | Rundle | 10965 Braddock Rd Culver City CA 90230 | **Left Blank on Docs | Allen Rundle and Elizabeth Rundle |
| | | | Elizabeth | Rundle | 10965 Braddock Rd Culver City CA 90230 | | |
| 33 | Yes | Yes | Sean | Wood | 202 Bear Drive Evergreen CO 80439 | Individual Ownership | Sean C. Wood |
| 34 | Yes | Yes | Gary | Watkins | 14188 W 3rd Place Golden, CO 80401 | Joint Tenants with Rights of Survivorship | Gary D. Watkins II, Suzanne M. Watkins |
| | | | Suzanne | Watkins | 14188 W 3rd Place Golden, CO 80401 | | |
| 35 | Yes | Yes | Cynthia | Karet | 522 Buena Vista Ct. Steamboat Springs CO 80487 | Individual Ownership | Derek L Hodson Cynthia T. Karet |
| | | | Derek | Hodson | 471 Eagle Pointe Ct. Steamboat Springs CO 80487 | | |
| 36 | Yes | Yes | Jason (Wally) | Waldron | 635 Old Sqaw Pass Rd Evergreen CO 80439 | Trust | Waldron Universal Ent, Ltd |
| 37 | Yes | Yes | John | Moyer | 1625 Mid Valley Drive Unit 1 PMB 117 Steamboat Springs 80407 | Individual Ownership | John D. Moyer |
| 38 | Yes | Yes | Cynthia E. | Morreale | 2800 S University Blvd Denver CO 80210 | Joint Tenants with Rights of Survivorship | Cynthia E. Morreale, Herbert L. Williams |
| | | | Herbert L. | Williams | 2800 S University Blvd Denver CO 80210 | | |
| 39 | Yes | Yes | Fred | Rundle | 4613 241st SE Issaquah WA 98029 | Individual Ownership | Frederick D. Rundle |
| 41 | Yes | Yes | Thomas | Crews | 9101 Harlan St Ste 215 Westmister, CO 80031 | Limited Liability Company | Crest Breaker Capital, LLC |
| | | | Jacob | Washer | 12833 South Wamblee Valley Rd Conifer, CO 80433 | | |
| 44 | Yes | Yes | John | Davie | 2193 Arapahoe St, Apt 13 Denver, CO 80205 | Individual Ownership | John Davie |
| 45 | Yes | Yes | Sheryl A. | McPhail | 6963 E. Montana Place Denver CO 80224 | Individual Ownership | Sheryl A. McPhail |
| 46 | Yes | Yes | Donna | Bair | 1568 Trail Creek Rd PObox 807 Idaho Springs, CO 80452 | Individual Ownership | Donna M Bair |
| 47 | Yes | Yes | Stacey | Kirkland | 26826 Evergreen Springs Rd Evergreen CO 80439 | Individual Ownership | Stacey Jo Kirkland |
| 48 | Yes | Yes | Stephanie | Copeland | 345 Lincoln Ave, Suite 206 Steamboat Springs CO 80487 | Limited Liability Company | 4PF Rural COZ Fund II, LLC |
| 49 | Yes | Yes | Steve | Zezulak | 1250 S. Buckley Rd Suite I-286, Aurora, CO 80017 | Limited Liability Company | Jordan-Stephens Group, LLC |
| 50 | Yes | Yes | Franklin (Chip) | Bair | 1568 Trail Creek Rd PObox 807 Idaho Springs, CO 80452 | Individual Ownership | Franklin W Bair Jr |
| 51 | Yes | Yes | Jacob | Mills | 201 Breakwater Ave Cordova, AK 99574 | Individual Ownership | Jacob B Mills |
| 52 | Yes | Yes | Gwynne | Witte | 2355 Morgan Ave N. Stillwater MN 55082 | Joint Tenants with Rights of Survivorship | Gwynne T. Witte and Cynthia T. Olson |
| | | | Cynthia T | Olsen | PO Box 1663 Idaho Springs 80452 | | |
| 53 | Yes | Yes | Rebecca | Cook | 168 Raccoon Circle Evergreen CO 80439 | Individual Ownership | Rebecca Cook |
| partner | | | Mary Jane | Loevlie | PO Box 218, Idaho Springs, CO 80452 | n/a | Mary Jane Loevlie |
| partner | | | Bryan | McFarland | 29025A  Upper Bear Creek Rd, Evergreen, CO 80439 | Mighty Argo Denali Holdings, LLC | LLC |

# EXHIBIT B

**Mighty Argo Cable Car, LLC**

**AND**

**First Title Inc.**

---

## ESCROW AGREEMENT

---

**THIS ESCROW AGREEMENT** ("**Agreement**") dated this 19th day of August, 2020 is made by and;

**BETWEEN:**

(1)     Mighty Argo Cable Car, LLC, a Colorado limited liability corporation, with a principal address of 1431 Miner Street, Idaho Springs, CO 80452 ("**Depositor**"); and

(2)     Trivecta Capital Group Inc. ("**TCG**" or "**Trivecta**"), a Delaware corporation located at 2808 Fairmount, Suite 130, Dallas TX 75201

(3)     **FIRST TITLE INC,** a company incorporated in the Commonwealth of Virginia and having its registered office at 1320 Central Park Blvd #200 Fredericksburg, VA 22401, ("**Escrow Agent**").

**WHEREAS:**

(A)     The Depositor and the Escrow Agent have agreed to enter into This Escrow Agreement.

(B)     In connection with This Escrow Agreement the Depositor has transferred or will transfer to the Escrow Agent such sums of money as is described in Schedule 1 hereto ("**Escrowed Funds**"), which is to be held in escrow in accordance with this Agreement.

**NOW IT IS AGREED** as follows:

1.     **Definitions**

1.1     In this Agreement the following words shall bear the meanings set opposite to them unless the context otherwise requires:

2

1.1.1 Escrowed   Funds          Has the meaning defined in recital (B) above.

1.2     Unless the context otherwise requires, words used herein importing the singular number shall include the plural number and vice-versa, words importing the masculine  gender only shall include the feminine gender and words importing persons only shall include companies or associations or bodies of persons whether incorporated or not.

1.3     The headings are intended for convenience only and shall not affect the construction of this Agreement.

1.4     For the purposes of this Agreement, the term "gross negligence" shall mean a standard of conduct beyond negligence whereby a person acts with reckless disregard for the consequences of his action or inaction.

## 2.     Appointment

The Depositor hereby appoints the Escrow Agent, and the Escrow Agent accepts such appointment, to act as escrow agent as set forth in this Escrow Agreement.

## 3.     Delivery of the Escrowed Funds

3.1     The Depositor shall transfer the Escrowed Funds to the Escrow Agent's account in accordance with Paragraph 11 below and Schedule 1.

3.2     The Escrow Agent will hold the Escrowed Funds in escrow in accordance with this Agreement.

## 4.     Release or Distribution of the Escrowed Funds

3

The Escrowed Funds shall be released to Depositor upon the closing and funding of the transaction contemplated by Trivecta and Depositor ("**Closing**"). Additionally, the Depositor may request the immediate release of the Escrowed Funds upon the occurrence of any event described in Paragraph 21 of this Agreement. Trivecta may also provide notice to Depositor if the Escrowed Funds are to be released earlier than the Closing for reasons not otherwise described in Paragraph 21.

5.      **Duties and Rights of the Escrow Agent**

5.1     *Duties are Administrative.* All parties acknowledge that the duties of the Escrow Agent are solely ministerial in nature, and have been requested for the convenience of the Depositor. The Escrow Agent shall not be treated as the agent of the Depositor and shall only be required to maintain and preserve any items delivered to it pursuant to this Agreement in the same manner and with the same care as it provides for similar items owned or held by it. The Escrow Agent shall not be liable for any act or omission taken or suffered with respect to this Agreement unless such act or omission is the direct result of the Escrow Agent's gross negligence or willful misconduct or unexcused failure to act in accordance with the provisions of this Agreement.

5.2     *Reliance.* The Escrow Agent may consult with legal counsel of its choice and shall be fully protected and incur no liability relative to any action or inaction taken in good faith in accordance with the advice of such counsel. The Escrow Agent shall have no responsibility for determining the genuineness or validity of any certificate, document, notice or other instrument or item presented to or deposited with it, and shall be fully protected in acting in accordance with any written instructions given to it by the Depositor and reasonably believed by Escrow Agent to have been signed by the proper representatives of such party.

5.3     *Legal Proceedings.* The Escrow Agent shall not be required to institute legal proceedings of any kind. If any conflicting demands are made upon the Escrow

Agent, the Escrow Agent shall not be required to determine which demand is justified or correct and which is unjustified or incorrect, and shall not be required to institute or otherwise take any action to resolve the conflicting demands, unless the language of this Agreement explicitly resolves the conflict. Instead, the Escrow Agent may await settlement of the controversy by appropriate and non-appealable legal proceedings and/or mutual agreement of the parties. Upon the commencement of any action against or otherwise involving the Escrow Agent with respect to this Agreement, the Escrow Agent shall be entitled to interplead the matter of this escrow into a court of competent jurisdiction in the Commonwealth of Virginia and, in that event, the Escrow Agent shall be relieved of and discharged from any and all obligations and liabilities under this Agreement.

6.    **Successor Escrow Agent.**

The Escrow Agent (or any successor to it appointed (i) in writing by the Depositor, or (ii) by a court of competent jurisdiction) may at any time resign and be discharged of the duties imposed under this Agreement by giving at least 60 days' written notice to the Depositor. If the Depositor has not appointed a successor to act as escrow agent within such 60 day period, the Escrow Agent shall have the right unilaterally to appoint the trust department of any national bank in the United States of America to act as successor escrow agent. The resignation of the Escrow Agent shall take effect upon the successor's acceptance of its appointment. Upon the effective date of such resignation and the successor's acceptance of its appointment, the Escrow Agent shall deliver to the successor Escrow Agent the Escrowed Funds then held by the Escrow Agent pursuant to this Agreement.

7.    **Dealing with other Persons**

Its duties hereunder shall not preclude the Escrow Agent from providing services of a like nature to any other person, corporation, partnership or other entity.

8.    **Remuneration of Escrow Agent**

8.1    The Escrow Agent shall be paid by Trivecta a one-time fee of 0.50% of the Escrowed Funds for the services described in this Agreement. The foregoing fee does not

5

include expense for wire charges and other out-of-pocket expenses that must be reimbursed to the Escrow Agent.

8.2      Trivecta Capital Group Inc. shall bear the full obligation to pay fees under Paragraphs 8.1 and 8.2, for the avoidance of doubt.

## 9.      Costs and Expenses

The Escrow Agent shall be entitled to be reimbursed for all out of pocket costs (including reasonable attorneys' fees and the allocated cost of in-house counsel) incurred by it in performing its duties under this Agreement. Trivecta shall be liable to the Escrow Agent for such costs.

## 10.     Notices

Any notice to be given hereunder shall be in writing and may be served by courier or personal delivery, or sent by Federal Express or similar carrier, or sent by certified mail, or telefaxed or emailed to the following addresses:

10.1   Trivecta at:  Trivecta Capital Group Inc.

10.2   the Depositor at:  Mighty Argo Cable Car, LLC
       Address:    PO Box 1201, Idaho Springs, CO 80452
       Attn: Bryan McFarland
       Attn: Mary Jane Loevlie
       Phone: 303-434-9435
       Email:       bryanmcfarland@mightyargo.com
       Email:       maryjaneloevlie@mightyargo.com

10.3   the Escrow Agent at:

       First Title Inc.,

       1320 Central Park Blvd #200 Fredericksburg, VA 22401

       (540)300-6040

       bacongroupinc@gmail.com

       Attn: Sandy Bacon

Notices shall be deemed to be delivered, when sent by courier or personal delivery upon receipt, three days after mailed when sent by FedEx or certified mail, and when sent by

telefax or email, on the business day when received as shown by a time stamp on such email or telefax.

11.     **Payments**

All payments and remittances by the Depositor to the Escrow Agent and by the Escrow Agent to the Depositor will be made by wire transfer of immediately available funds to the account or the address that the recipient specifies to the payor from time to time. The initial wire transfer address for the Escrow Agent is indicated at Schedule 1.

12.     **Indemnity**

Trivecta shall be obligated to reimburse the Escrow Agent for, indemnify and hold the Escrow Agent harmless against, all loss, liability, cost or expense, including reasonable attorneys' fees (including the allocated cost of in-house counsel) and other costs incurred by the Escrow Agent in acting as such under this Agreement, except to the extent incurred as a direct result of the Escrow Agent's gross negligence or willful misconduct or unexcused failure to act in accordance with the provisions of this Agreement.

Escrow Agent shall indemnify and hold harmless Trivecta and Depositor against, all loss, liability, cost or expense, including reasonable attorneys' fees (including the allocated cost of in-house counsel) and other costs incurred by Trivecta or Depositor due to Escrow Agent's gross negligence or willful misconduct or unexcused failure to act in accordance with the provisions of this Agreement.

13.     **Entire Agreement**

This Agreement embodies the entire agreement and understanding of the parties with respect to its subject matter. There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth or referred to herein. This Agreement supersedes any and all prior agreements and understandings between the parties with respect to such subject matter.

14.     **Waiver**

7

In the absence of written agreement to the contrary, no neglect omission or forbearance on the part of any party to this Agreement to take advantage of or enforce any right or remedy arising out of the terms and conditions contained or implied in this Agreement shall be deemed to be or operate as a general waiver of that term or condition or the right to enforce or take advantage of it in respect of any breach or non-observance of it either original or recurring.

### 15. Amendment

This Agreement may be amended only in a writing signed by the parties.

### 16. Successors and Assigns.

This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

### 17. Invalidity of Provisions

In the event that any provision of this Agreement or its application to any person or circumstance is or is found to be invalid or unenforceable, the invalidity or unenforceability of such provision shall not affect the validity or enforceability of the other provisions and the said other provisions shall remain in full force and effect.

### 18. Severability

The invalidity or unenforceability of any provision of this Agreement shall not impair the validity or enforceability of any other provision.

### 19. Governing Law

This Agreement shall be governed by and construed in accordance with the laws of Virginia to the exclusive jurisdiction of whose courts the parties hereto hereby submit and no proceedings shall be brought in the courts of any other jurisdiction.

### 20. Counterparts

This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed originals and all of which together shall constitute one and the same instrument.

21.    **Non-Performance as Related to Trivecta Capital Group Inc.**

In the event Trivecta fails to perform as required under this Agreement, under the Term Sheet, or as otherwise agreed to by the parties in related loan documentation, Trivecta shall immediately authorize Escrow Agent to return all Escrowed Funds to Depositor as soon as reasonably practicable, but in no case later than 7-10 banking days after such authorization to the account designated by the Depositor in writing.

In the event the Depositor is unable to close on requested loan for any reason, including as related toa result of unforeseen issues, not including bank closures, natural disasters, acts of God, etc., Trivecta shall immediately authorize Escrow Agent to return all Escrowed Funds to Depositor as soon as reasonably practicable, but no later than 7-10 banking days after such authorization to the account designated by the Depositor in writing.

IN WITNESS WHEREOF this Agreement has been executed by the parties hereto on the date first before written.

**DEPOSITOR**
Mighty Argo Cable Car, LLC,
a Colorado limited liability company

By: _____

Name: Mary Jane Loevlie
Its: Manager

DATE: 8-19-2020


**TRIVECTA**
Trivecta Capital Group Inc.,
a Delaware corporation

By: _____

Name: Jay Matthiesen
Its: President

DATE: 08.19.2020


**ESCROW AGENT**


SIGNED: _____

FULL NAME: _____

DATE: _____

## SCHEDULE 1

### Escrowed Funds Coordinates

FIRST TITLE INC.
C/O Sandy Bacon
1320 Central Park Blvd #200 Fredericksburg, VA 22401
(540)300-6040
bacongroupinc@gmail.com (please send wire confirmation to this email address)

Navy Federal Credit Union
PO Box 300
Merrifield, VA

ABA/ROUTING NUMBER: 256074974
NFCU ACCOUNT NUMBER: SEE BELOW

**Amount:** $4,500,000.00 (Four Million Five Hundred Thousand US Dollars)

**ESCROW INSTRUCTION**

**BE ADVISED: For insurance coverage purposes, we ask clients making deposits over $2,000,000 to make multiple transfers. For assistance, please contact 1st Title Directly (540) 736-3131 or speak with Trivecta for Assistance.**

**Use any of the following accounts:**
**NFCU ACCOUNT NUMBER: 7107728730**
**NFCU ACCOUNT NUMBER: 7107728698**
**NFCU ACCOUNT NUMBER: 7090027488**

**Reference in Memo: Lender file - 8 0 1 5 7 2 4**

**PLEASE DO NOT SEND FUNDS IF YOU HAVE NOT EXECUTED THE ESCROW AGREEMENT. 1stTitle will reject any deposits if there is no Escrow Agreement to Correspond with the deposit.**

# EXHIBIT C

February 22, 2021

First Title Inc.
Attn: Sandy Bacon; John Bacon
1320 Central Park Blvd #200
Fredericksburg, VA 22401

First Title Inc.
Attn: Sandy Bacon, Registered Agent
10109 Mindy Ct.
Fredericksburg, VA 22408

The Bacon Group Incorporated
Attn: Sandy Bacon
306 Westwood Office Park
Fredericksburg, VA 22401

Copy to: The Deyon Law Group, PLLC
Attn: Derek H. Deyon, Esq.
2929 Allen Parkway, Suite 200
Houston, Texas 77019

Copy to: First Allegiance
Attn: Chrissy Marius

Copy to: KC Gull
Attn: Chrissy McGee; Chrissy Marius;
Attn: Christina Marius
Attn: Erica Bergeron
Attn: Natalie Charles
2219 Sawdust Road, Suite 1803
Spring, TX 77830

Re: Demand for Immediate Release of Escrow Funds pursuant to that certain Escrow Agreement dated August 19, 2020 ("Escrow Agreement") entered into by Mighty Argo Cable Car, LLC, a Colorado limited liability company ("Depositor"), Trivecta Capital Group Inc. ("Trivecta"), and First Title Inc. ("First Title").

Dear Ms. Bacon:

In accordance with the Escrow Agreement, Depositor has deposited funds totaling Four Million Five Hundred Thousand and 00/100 ($4,500,000.00) ("Escrow Funds") with First Title via successive wire transfers beginning on August 20, 2020. A copy of the Escrow Agreement is enclosed for ease of reference. First Title, through Sandy Bacon, has acknowledged receipt of the Escrow Funds, and is holding the Escrow Funds pursuant to the terms of the Escrow Agreement. A copy of First Title's confirmation of receipt of funds is enclosed.

On numerous occasions over the past month, Trivecta and Depositor have requested and authorized the release of the Escrow Funds, but to date, First Title has failed to proceed as directed.

Pursuant to Paragraphs 4 and 21 of the Escrow Agreement, Trivecta and Depositor hereby demand and authorize First Title to immediately release the Escrow Funds to Fidelity National Title c/o Stephanie Taylor, with wiring instructions to be provided in a follow-up communication.

Please contact Jay Matthiesen with Trivecta at (214) 455-3340 at your earliest convenience to discuss further.

Sincerely,

Trivecta Capital Group Inc.

By: _____
Jay Matthiesen

Mighty Argo Cable Car, LLC

By: _____
Mary Jane Loevlie

# EXHIBIT D

## CONSTRUCTION LOAN AGREEMENT

This Construction Loan Agreement is made as of January 20, 2021, by and between **MIGHTY ARGO CABLE CAR, LLC**, a Colorado limited liability company ("**Borrower**"), having its principal office at 1431 Miner Street, PO BOX 1201, Idaho Springs, Colorado 80452, and **ARGO MILL SL LLC**, a Delaware limited liability company, and its successors or assigns ("**Lender**"), whose mailing address is 2808 Fairmont Street, Suite 130, Dallas, Texas 75201.

## RECITALS:

A.      Borrower owns fee simple title to that certain real property located in the County of Clear Creek, State of Colorado, as more particularly described in **Exhibit A** attached hereto (the "**Premises**").

B.      Borrower has applied to Lender for a construction loan for the purpose of paying the costs of constructing the Improvements (as hereinafter defined) and other related development costs approved by Lender, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the covenants and conditions herein contained, the parties agree as follows:

1.      **DEFINITIONS**

1.1      **Definitions**.  As used herein, the following terms have the meanings set forth below:

"**Advance**" means a disbursement of Loan proceeds.

"**Agreement**" means this Construction Loan Agreement, as the same may be amended and supplemented as hereinafter provided.

"**Appraisal**" means an appraisal that: (i) complies with Title XI of the Financial Institutions Reform Recovery and Enforcement Act of 1989, and the Uniform Standards of Professional Appraisal Practice; (ii) is in form and substance acceptable to Lender; and, (iii) has been prepared by an appraiser who has an MAI membership designation and is acceptable to Lender.

"**Authorized Representative of Borrower**" means the person or persons designated by Borrower to submit Borrowing Requests on behalf of Borrower, and to take any and all actions on the part of Borrower under any of the Loan Documents.

"**Borrower**" has the meaning given such term in the preamble to this Agreement.

"**Borrower's Articles of Organization**" means those certain Articles of Organization of Borrower, dated October 29, 2019, and filed with the Colorado Secretary of State on October 29, 2019, pursuant to which Borrower has been formed, together with all modifications and amendments thereto.

"**Borrower's Operating Agreement**" means that certain Operating Agreement of Borrower, dated as of August 27, 2020, together with all modifications and amendments thereto.

"**Budget**" means a maximum budget for the Project, as modified from time to time pursuant to the terms of this Agreement.  The budget and each modification thereof is to be approved by Lender.  As of the date hereof the Budget is in the form of **Exhibit B** attached hereto.

"**Business Day**" means a day of the year other than Saturdays, Sundays, and legal holidays on which Lender's office located at 2808 Fairmont Street, Suite 130, Dallas, Texas 75201 is closed.

"**CC&Rs**" means any covenants, conditions, restrictions, maintenance agreements or reciprocal easement agreements affecting the Premises or the Project.

"**Certificate of Substantial Completion**" means a certificate in the form of AIA Form G-704, or in another format approved by Lender, executed by the Architect, Borrower and the General Contractor.

"**Certification of Non-Foreign Status**" means an affidavit, signed under penalty of perjury by an authorized representative of Borrower, or if Borrower is a disregarded entity as defined in Treasury Regulation §1.1445-2(b)(2)(iii), the owner of the disregarded entity, stating (a) that Borrower or such owner is not a "disregarded entity", "foreign corporation", "foreign partnership", "foreign trust", or "foreign estate", as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder, (b) Borrower's or such owner's U.S. employer identification number, and (c) the address of Borrower's or such owner's principal place of business.  Such affidavit must be consistent with the requirements of the regulations promulgated under Section 1445 of the Internal Revenue Code, and must otherwise be in form and substance acceptable to Lender.

"**Change Orders**" means any change in the Plans and Specifications, the General Contract or any Subcontracts relating thereto, the Construction Schedule, or any Subcontracts relating thereto, which change has been approved by (a) the Borrower, (b) the Lender (subject to **Section 6.8**), and (c) the General Contractor.

"**Closing Date**" means the date of the Agreement.

"**Collateral**" means all collateral described in the Loan Documents.

"**Completion Date**" means on or before November 1, 2022, subject to adjustments due to force majeure events (not to exceed 90 days).

"**Completion Guaranty**" means that certain Completion Guaranty of even date herewith executed by Guarantor.

"**Construction Contract**" means any contract (other than the General Contract) relating to work performed or to be performed for the Improvements executed or to be executed by Borrower.

2

"**<u>Construction Contractor</u>**" means any contractor who is a party to a Construction Contract.

"**<u>Construction Period</u>**" means that period of time commencing on the Closing Date and ending on the date the Improvements are Substantially Complete.

"**<u>Construction Schedule</u>**" means a construction schedule in a form approved by Lender showing a trade-by-trade breakdown of the estimated periods of commencement and completion of construction of the Improvements.

"**<u>County</u>**" means the County of Clear Creek, State of Colorado.

"**<u>Debt Service Amount</u>**" means, with respect to determination of the Debt Service Coverage Ratio, the annualized payments of principal and interest that would be necessary to fully amortize an assumed loan with the following characteristics: (i) the principal amount is the Loan Amount on the date of calculation of the Debt Service Coverage Ratio, (ii) the amortization period is 30 years; and (iii) the actual Interest Rate in effect under the Note on the date of determination.

"**<u>Debt Service Coverage Ratio</u>**" means the number determined by Lender obtained by dividing (i) the Net Operating Income for the previous twelve month period, by (ii) the Debt Service Amount for the previous twelve month period.

"**<u>Deed of Trust</u>**" means a construction deed of trust and fixture filing, with assignment of rents and security agreement, executed by Borrower, as trustor, to the Public Trustee of the County of Clear Creek, Colorado, as trustee, and naming Lender, as beneficiary, creating a first lien on the Premises, the Improvements, and all other buildings, fixtures and improvements now or hereafter owned or acquired by Borrower and situated thereon, and all rights and easements appurtenant thereto, securing indebtedness in the amount of the Loan Amount, all in form and substance acceptable to Lender.

"**<u>Default Interest Rate</u>**" has the meaning set forth in **<u>Section 2.4(c)</u>**.

"**<u>Environmental Indemnity</u>**" means that certain Environmental Indemnity Agreement of even date herewith executed by Borrower and Guarantor.

"**<u>ESCO</u>**" means ESCO Construction Co.

"**<u>ESCO General Contract</u>**" means that certain General Contractor Agreement dated August 1, 2020 between Borrower and ESCO and all associated Exhibits and Contract Documents, relating to the construction of the Improvements.

"**<u>Event of Default</u>**" means the occurrence of any of the events listed in **<u>Section 7.1(a)</u>** and the expiration of any applicable notice and cure period provided in said Section.

"**<u>First Extended Term</u>**" has the meaning set forth in **<u>Section 2.7</u>**.

"**<u>First Principal Payment Date</u>**" has the meaning set forth in **<u>Section 2.5</u>**.

3

"**<u>Financing Statement</u>**" means a UCC-1 financing statement authorized by Borrower as debtor, in favor of Lender as secured party, and perfecting (to the extent that a security interest can be perfected by the filing of a UCC-1 financing statement under applicable law) Lender's security interest in the Collateral now owned or hereafter acquired by Borrower, in form and substance satisfactory to Lender, to be filed in the Office of the Secretary of State of Colorado, and in such other offices for recording or filing such statements in such jurisdictions as Lender desires to perfect Lender's security interest or reflect such interest in appropriate public records.

"**<u>General Contract</u>**" means, collectively, the White General Contract, the Leitner General Contract, and the ESCO General Contract.

"**<u>General Contractor</u>**" means, collectively, White, Leitner, and ESCO.

"**<u>Governmental Authority</u>**" means any arbitrator, other private adjudicator, court, government or governmental authority (federal, state, local or foreign).

"**<u>Gross Income</u>**" means all income of the Project of any type, including, without limitation, rents, forfeited security deposits, rent interruption insurance, actual Tenant reimbursements, and parking revenue.

"**<u>Guarantor</u>**" means Mary Jane Loevlie.

"**<u>Hard Costs</u>**" or "**<u>Direct Costs</u>**" means all costs incurred for labor performed in the construction of the Improvements and the materials incorporated into the Improvements.

"**<u>Improvements</u>**" means the improvements constructed and to be constructed on the Premises, which will consist of a detachable gondola, upper landing system, lower landing and parking deck, all in accordance with the Plans and Specifications.

"**<u>Initial Draw</u>**" means an amount approved by Lender.  Subject to the terms and conditions hereinafter set forth, the proceeds of the Initial Draw may be used only for the payment of the Loan Fee, the payment of interest pursuant to **<u>Section 4.5</u>**, the payment of expenses, charges, costs and fees pursuant to **<u>Section 8.10</u>**, and the payment of such Hard Costs and Soft Costs as Lender, in its sole discretion, may specifically approve in writing or in the Budget.

"**<u>Inspecting Architect</u>**" means Lender's architect or such other third-party consultants employed by Lender for the purpose of, among other things, reviewing the Plans and Specifications, the quality and course of construction of the Project, the General Contract, the Construction Contracts, the Subcontracts and all Change Orders.

"**<u>Interest Rate</u>**" has the meaning set forth in the Note.

"**<u>Interest Reserve</u>**" has the meaning set forth in **<u>Section 4.10</u>**.

"**<u>Leitner</u>**" means Leitner-Poma of America, Inc.

4

"**Leitner General Contract**" means that certain Agreement dated September 17, 2019 by and between Borrower (as successor to Argo Holdings, LLC) and Leitner and all associated Exhibits and Contract Documents, relating to the construction of the Improvements.

"**Lender**" has the meaning given such term in the preamble to this Agreement.

"**Lien-Free Completion**" means the satisfaction of all of the following conditions:

(a)     Construction of the Improvements has been completed in accordance with the Plans and Specifications, free and clear of all mechanics' liens and similar claims, and in accordance with all applicable governmental rules, regulations and requirements;

(b)     Borrower has delivered to Lender evidence that all costs of construction have been paid, which evidence shall include such commercially reasonable lien waivers as Lender may require;

(c)     Lender and Lender's inspector have viewed and inspected the Project, and Lender's inspector has provided Lender with a report satisfactory to Lender as the quality of construction and structural and mechanical soundness of the Improvements, and as to such other matters as Lender may reasonably require;

(d)     Borrower has delivered to Lender a copy of a permanent certificate of occupancy for the Improvements;

(e)     If required by Lender, Lender has received endorsements to the Title Insurance Policy in form and content satisfactory to Lender provided such endorsements may be obtained from the Title Company; and

(f)     If required by Lender, Borrower has delivered to Lender certification by the architect for the Project that the Improvements have been completed in accordance with the Plans and Specifications.

"**Loan**" means the loan from Lender to Borrower described in this Agreement in the principal amount of up to the Loan Amount.

"**Loan Amount**" means the amount of up to $33,900,000.00, plus any sum in addition thereto advanced by Lender at its discretion in accordance with the Loan Documents.

"**Loan Documents**" means the documents described in **Section 3.1**.

"**Loan Fee**" means an amount equal to $678,000.00.

"**Loan Parties**" or "**Loan Party**" means Borrower, Guarantor, and each other Person that is or hereafter becomes a party to any Loan Document.

"**Material Adverse Change**" means any change in the assets, business, financial condition, operations, prospects, or results of operations of any Loan Party or any other event or condition that in the reasonable opinion of Lender (i) materially adversely affects the likelihood

of performance by any Loan Party of any of the Obligations, (ii) materially adversely affects the ability of any Loan Party to perform any of the Obligations, (iii) materially adversely affects the legality, validity, or binding nature of any of the Obligations or any lien securing any of the Obligations, or (iv) materially adversely affects the priority of any lien securing any of the Obligations.

"**Maturity Date**" has the meaning as set forth in **Section 2.3**.

"**Net Operating Income**" means the amount by which Gross Income of the Project exceeds Operating Expenses of the Project for the applicable period.

"**Operating Expenses**" means all ordinary and normal expenses of operation of the Project for the prior twelve (12) month period, including, without limitation, property taxes and insurance premiums (as allocated to the Project on an annualized basis), utilities, repairs and maintenance, salaries and wages, capital replacements, commissions paid to any leasing agent, reasonable advertising and marketing expenses and four percent (4%) of Gross Income for the applicable period as an assumed management fee (or actual management fee if greater); excluding, however, depreciation, income or franchise taxes, and the amount of principal and interest paid with respect to the Loan.

"**Non-Recourse Carve Out Guaranty**" means that certain Non-Recourse Carve Out Guaranty of even date herewith executed by Guarantor.

"**Note**" means that certain Secured Promissory Note evidencing the Loan.

"**Obligations**" means the obligations of the Loan Parties under the Loan Documents.

"**Permitted Exceptions**" means the items defined in and listed on Exhibit C to the Deed of Trust.

"**Person**" means any natural person, any unincorporated association, any corporation, any partnership, any joint venture, any trust, any limited liability company, any other legal entity, or any Governmental Authority.

"**Plans and Specifications**" means the final plans and specifications for the construction of the Improvements, with evidence of appropriate governmental approvals shown thereon, as approved by Lender in its sole discretion and as changed from time to time pursuant to this Agreement.

"**Preliminary Title Report**" means that certain commitment for title insurance, File No. 100-N0030661-020-ST, dated December 29, 2020, and issued by the Title Company covering the Premises and showing all exceptions to title and accompanied by legible copies of all such recorded exceptions.

"**Premises**" means that certain real property located in the County of Clear Creek, State of Colorado, as more particularly described on **Exhibit A** attached hereto.

"**Project**" means the Improvements and the Premises.

6

"**Project Costs**" means the total, as shown on the Budget, of all costs, expenses and fees required to construct the Improvements in accordance with the Plans and Specifications, and operate the Project, including the Interest Reserve, until the Maturity Date.

"**Property Manager**" means a property manager to be determined by Borrower after the Closing Date, and reasonably approved by Lender, or a successor property manager proposed by Borrower and approved by Lender in its reasonable discretion.

"**Retainage**" means with respect to the General Contract, each Construction Contract and each Subcontract, five percent (5%) of (i) all Hard Costs and (ii) the cost of materials. Notwithstanding the foregoing, the following items are not subject to retainage: General Conditions, insurance, bonds (if applicable), Construction Manager's Fee.

"**Second Extended Term**" has the meaning set forth set forth in **Section 2.7**.

"**Soft Costs**" or "**Indirect Costs**" means all costs designated as "Soft Costs" on the Budget.

"**Standard Lease Form**" means the standard lease form for the leasing of space in the Project as approved by Lender prior to the execution of any Tenant Lease after the date hereof, which standard lease form must not be materially modified in any way without Lender's prior written approval.

"**Stored Materials**" means materials purchased or to be purchased by Borrower, the General Contractor or a Construction Contractor at the date of a request for disbursement, but not yet installed or incorporated into the Project.

"**Subcontract**" means a contract relating to any work performed or to be performed for the Project executed or to be executed by General Contractor or a Construction Contractor with a Subcontractor.

"**Subcontractor**" means any contractor who is a party to a Subcontract other than the General Contractor or a Construction Contractor.

"**Substantially Complete**" or "**Substantial Completion**" means such time as Lender has approved the completed work under the General Contract and has received a Certificate of Substantial Completion.

"**Survey**" means a current survey of the Premises prepared by a surveyor registered or licensed in the State of Colorado, which survey (i) is in form and substance satisfactory to Lender in Lender's sole and absolute discretion and (ii) contains a certification is the form attached hereto as **Exhibit E**.

"**Tenant**" means all persons or entities occupying space in the Improvements.

"**Tenant Lease**" means a lease of, or other occupancy agreement with respect to, space in the Improvements.

7

"**Title Company**" means Fidelity National Title.

"**Title Insurance Policy**" means a title insurance policy in the form of an American Land Title Association Loan Policy-2006 extended coverage (without revision, modification or amendment) issued by the Title Company, with coverage in an amount not less than the Loan Amount (without incremental coverage endorsements being required) and without any exception that limits coverage to disbursements made and approved by the Title Company, in form and substance reasonably satisfactory to Lender and containing such endorsements as Lender may reasonably require.

"**Transfer**" has the meaning as set forth in the Deed of Trust.

"**Unconditional Lien Waiver and Release**" means a written unconditional waiver and release of mechanic's lien or bond rights in form and substance reasonably acceptable to Lender.

"**Unmatured Event of Default**" means any event that with the giving of notice or the passage of time, or both, would constitute an Event of Default.

"**White**" means White Construction Group.

"**White General Contract**" means that certain AIA Document A133-2019, dated January ___, 2021 between Borrower and White and all associated Exhibits and Contract Documents, relating to the construction of the Improvements.

1.2     **Accounting Terms**.  For purposes of this Agreement, all accounting terms not otherwise defined herein or in the Recitals have the meanings assigned to them in conformity with generally accepted accounting principles consistently applied.

2.     **THE LOAN**

2.1     **Agreement to Lend and Borrow**.  Subject to the terms and conditions of this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender up to the Loan Amount.  The Loan proceeds will be used for the financing, marketing, construction, completion and stabilization of the Project.

2.2     **Interest**.  Interest shall accrue and become due and payable in accordance with the terms of the Note.  **Interest on the Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under the Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in the Note.  By executing below, Borrower hereby acknowledges and agrees to the calculation of the Interest Rate in accordance with a year of 360 days and acknowledges that calculation of interest in accordance with this Section will increase the Loan's effective interest rate above the Interest Rate and Default Interest Rate, as applicable, stated in the Note.**

8

2.3     **Payment of Principal and Interest**.  The outstanding principal balance of the Loan, together with all unpaid accrued interest thereon, and all other amounts payable by Borrower with respect to the Note pursuant to the terms of any other Loan Document, shall be due and payable in accordance with the terms of the Note.

2.4     **Prepayment of Principal**.  Prepayment of the Loan shall be subject to the terms and conditions of the Note.

2.5     **Security Interest.**  As additional security for the Obligations, Borrower hereby pledges, assigns, transfers and grants to Lender a security interest in, a lien on and an express contractual right to set off against (or refuse to allow withdrawals from) all depository account balances, cash and any other property (tangible or intangible) of Borrower now or hereafter in the possession of Lender during the term of this Agreement, including, without limitation, (i) all amounts that are at any time held in the Interest Reserve (whether held in an account or otherwise), (ii) all amounts deposited in the account for the deposit of Loan proceeds pursuant to **Section 4.3(c)**, all operating accounts of Borrower, and all funds at any time placed therein, (iii) all amounts that might at any time be held by Lender pursuant to **Section 4.10** and (iii) any other portion of the Loan that might at any time not have been advanced to Borrower.  Lender may, at any time upon and during the occurrence of an Event of Default, after the expiration of any applicable cure rights of Borrower, set off funds against the Obligations, if the Obligations (including future payment installments) are then due or have been accelerated, all without any advance or contemporaneous notice or demand of any kind to Borrower, such notice and demand being expressly waived by Borrower.  So long as any Event of Default exists, Lender shall have such rights with respect to all of such funds and property as are provided by applicable law and may apply such funds and property towards the satisfaction of the Obligations.  No delay or omission of Lender in exercising any right to apply such funds or property shall impair any such right, or shall be construed as a waiver of, or acquiescence in, any Event of Default.  At the request of Lender, Borrower shall execute and deliver from time to time such documents as may be necessary or appropriate, in Lender's sole judgment, to assure Lender that it has a first priority perfected security interest in and lien on such funds and property.

2.6     **Security**.  Payment of the Note is secured by the following:

(a)     the Deed of Trust;

(b)     the Financing Statement;

(c)     the assignments of, and a first priority security interest in, the Plans and Specifications; the General Contract; the Construction Contracts; the agreement with the Property Manager; and, to the extent to which they may be assigned, all other rights, licenses, permits, franchises, authorizations, approvals and agreements relating to construction of the Project, or required for the use, occupancy or operation of the Project, including all grading, demolition, building and other governmental permits and entitlements to use.

9

2.7     **Extensions**.  The Maturity Date of the Note and Loan Amount may be extended to January 20, 2025 as set forth in the Note ("**First Extended Term**") and further extended to January 20, 2026 as set forth in the Note ("**Second Extended Term**").

3.     **LOAN CLOSING; USE OF LOAN PROCEEDS**

3.1     **Conditions Precedent**.  Lender's obligation to make the Initial Draw and to perform the remainder of its obligations under this Agreement are expressly conditioned upon (i) Borrower's satisfaction of all of the conditions set forth in **Exhibit C**; (ii) Borrower's satisfaction of the conditions for disbursement set forth in **Article 4** (as applicable); (iii) Borrower's payment of the Loan Fee; (iv) the Title Company's commitment to issue the Title Insurance Policy; and (v) Borrower's delivery to Lender of the following documents, in form and content satisfactory to Lender, duly executed (and acknowledged where necessary) by the appropriate parties thereto:

(a)     This Agreement;

(b)     The Note;

(c)     The Deed of Trust, which will be duly recorded in the Official Records of the County;

(d)     The Financing Statement, which will be duly filed with the Colorado Secretary of State;

(e)     The Completion Guaranty;

(f)     The Non-Recourse Carve Out Guaranty;

(g)     The Environmental Indemnity;

(h)     The assignments of the General Contract, the Plans and Specifications, the Construction Contracts, the agreement with the Property Manager, and the other agreements, contracts, rights, permits, licenses, entitlements, authorizations, and franchises described in **Section 2.12(d)**, and consents to such assignments where deemed appropriate by Lender; and

(i)     Such other documents that Lender may reasonably require.

3.2     **Conditions Precedent to Further Advances**.  Lender has no obligation to make any Advance, other than the Initial Draw, if any, until Borrower has provided Lender with satisfactory evidence that Borrower has paid from its own funds the difference between the total Project Costs shown on the initial Budget and the Loan Amount and/or prepaid any such difference, which equity amount is not less than $6,000,000.00. Lender acknowledges and agrees it has received greater than or equal to such equity amount from Borrower as of the effective date hereof. Any amounts deposited by Borrower with Lender pursuant to this provision will be disbursed in accordance with the terms of this Agreement for the payment of Hard Costs and Soft Costs prior to any further disbursement of Loan funds.

3.3 **Use of Loan Proceeds.** Subject to all of the terms and conditions of this Agreement, the proceeds of the Loan shall be used by Borrower as follows:

(a) The portion of the Loan proceeds designated for "Interest Reserve" on the Budget shall be advanced by Lender in accordance with **Section 4.10**.

(b) A portion of the Loan shall be used to pay the Loan Fee and certain costs and expenses incurred in connection with the Closing of the Loan, pursuant to **Section 2.**

(c) The balance of the proceeds of the Loan shall be used by Borrower to pay a portion of the costs of constructing and operating the Improvements, in accordance with the Budget.

4. **DISBURSEMENTS OF THE LOAN**

4.1 **Use of Disbursements; Revision of the Budget**.

(a) Borrower will use disbursements of the Loan only for the payment of or reimbursement for Project Costs as shown on the Budget and approved by Lender pursuant to **Sections 4.1(b)** and **4.1(c)**, as such Project Costs are incurred by Borrower. Project Costs will be deemed to have been "incurred" by Borrower at the following times: (i) Hard Costs: when the labor has been performed or the materials have been supplied and incorporated into the Project, payment therefor has been requested by the contractor or supplier thereof, and such contractor or supplier is entitled thereto; and (ii) Soft Costs: when such costs have been paid or are due and payable and the services relating thereto have been rendered or the value thereof has been received by Borrower. Except as set forth in **Section 4.9**, Lender will have no obligation to make disbursements for Stored Materials. As of the date hereof, Project Costs consist of the total of all the costs, expenses and fees listed as "Hard Costs" or "Direct Costs" and "Soft Costs" or "Indirect Costs" on the Budget.

(b) The Budget will be subject to revision from time to time as Lender may require or approve in accordance with this **Section 4.1(b)**. Lender has the right, in its sole discretion, to increase or decrease the allocation to the contingency, interest reserve and tax reserve categories and except for those items approved in the Budget, to determine whether any additional item of cost, expense or fee for which Borrower requests a disbursement constitutes a Project Cost and to which category such cost, expense or fee will be applied. The maximum amount that Lender is obligated to disburse for any item of Project Costs will not exceed the amount designated for such category on the Budget as it may be amended from time to time by Lender pursuant to the last preceding sentence.

(c) All modifications to the Budget will be evidenced by a new Budget approved by Lender in its sole discretion.

(d) Notwithstanding the foregoing, Borrower shall not be entitled to reallocate any amount allocated to the Interest Reserve without Lender's prior approval, which may be withheld in Lender's sole discretion.

4817-3213-1027

4.2     **Requests for Disbursements**.

(a)     Borrower may request disbursements of the Loan not more frequently than monthly unless otherwise agreed to by Lender or in the case of an emergency.  Each request for disbursement shall be accompanied by a Request for Loan Advance form attached hereto as **Exhibit D**, which shall be properly completed and signed by an Authorized Representative of Borrower, and approved by such persons as Lender may direct.  In addition to the Request for Loan Advance, for each request for disbursement, Borrower shall deliver to Lender the following:

(i)     An itemized project budget spreadsheet, including columns for original Budget, reallocations permitted under this Agreement, previously drawn amounts and current draw amounts;

(ii)     A current Change Order log or similar evidence of pending Change Orders;

(iii)     AIA Form G702 and Form G703 Pay Application as submitted by the General Contractor and approved by Borrower and Borrower's architect;

(iv)     A vendor payee list;

(v)     Change Order and line item transfer request forms as applicable to the current request for disbursement; provided, that Change Orders shall be subject to Lender's approval in accordance with **Section 6.8** of this Agreement.

(b)     Lender will fund each approved requisition within ten (10) Business Days following receipt of all supporting instruments and documents which Lender may require.  In connection with Advances, Lender may require on-site inspections and a review of construction (i) to verify percentage of completion and the estimated cost to complete the Improvements, and (ii) to certify disbursement requests.  Any such inspections will be for the sole use and benefit of Lender, and neither Borrower nor any third party may be entitled to rely thereon for any purpose.  As provided in **Section 8.9**, Lender will be reimbursed for its reasonable costs in connection with such requisitions.

(c)     Each requisition thereby constitutes, without the necessity of specifically containing a written statement, a representation and warranty by Borrower with respect to the item for which payment is requested that (i) if the item is work or materials, it has been physically incorporated into or stored on the Premises, free of all liens and encumbrances (except for those to be discharged in full with the proceeds of the requested advance), (ii) the item is included in the Budget, (iii) the cost of the item is as specified in the requisition and Budget (or if not, that Borrower has paid any excess), (iv) the work, materials or other item substantially conforms to the Plans and Specifications and all applicable statutes, laws, ordinances, administrative rules, regulations and other legal requirements, (v) the item has been approved by all zoning, building and other governmental officers, offices or departments having jurisdiction and whose approval is required, and (vi) to Borrower's actual knowledge, without duty of inquiry, the representations and warranties of Borrower contained in this Agreement are true and correct in all material respects as if made on the date of the request for disbursement.

4.3 **Amount of and Conditions to Disbursements**.

(a) Borrower will not be entitled to any Advance unless:

(i) If the costs set forth in the General Contract are less than the construction costs previously reviewed and approved by Lender, Lender, at its option, will have the right to reduce the Loan Amount by the amount of any such reduction or reallocate the amount of any such reduction to the hard cost contingency line item set forth in the Budget;

(ii) the representations and warranties as specified in **Section 4.2(b)** are true and correct in all material respects at the date of the Advance;

(iii) the costs set forth in all prior requisitions have been duly paid by Borrower;

(iv) the Title Company issues to Lender, at Borrower's expense, the endorsements to the Title Policy as may be required by Lender, including, without limitation, the foundation endorsements described in **Section 4.6**;

(v) Borrower shall have furnished to Lender (1) copies of all invoices and Conditional Lien Waivers and Releases covering work completed and/or materials furnished in connection with the pending request for Advance, and (2) copies of receipts for the payment of bills and copies of Unconditional Lien Waivers and Releases covering work completed and/or materials furnished in connection with the work which was to have been paid from the prior disbursement;

(vi) no Event of Default exists under this Agreement or any of the other Loan Documents nor any event exists which, with the giving of notice or the passage of time, or both, would constitute an Event of Default hereunder or thereunder;

(vii) Lender has received and approved true, correct and complete copies of all Construction Contracts and, if required by Lender, Subcontracts executed since the last disbursement and not previously delivered to Lender, all construction bonds on those Construction Contracts and Subcontracts which have been obtained by such Construction Contractor or the General Contractor, and all Change Orders as required under **Section 6.8** not previously delivered to Lender;

(viii) Lender has completed its inspection pursuant to **Section 4.2(a)**;

(ix) the Loan is "in balance" as required in **Section 4.4**;

(x) Borrower has satisfied the conditions of **Section 4.9** with respect to the disbursement of Retainage (if applicable); and

(xi)     Borrower has satisfied the conditions in **Section 4.8** with respect to a disbursement for Stored Materials (if applicable);

(xii)    the costs are within the amount recommended by the Inspecting Architect;

(xiii)   if the Improvements have been damaged by fire or other casualty, Lender has received insurance proceeds sufficient in the reasonable judgment of Lender to effect the restoration thereof and to permit the completion of the Improvements on or before the Completion Date; and

(xiv)    there are no liens outstanding against the Project, or matters affecting title to the Premises, other than the lien of the Deed of Trust and the Permitted Exceptions. Notwithstanding the foregoing, Borrower shall be entitled to bond around any such liens and in such case shall be entitled to any Advance provided all additional conditions set forth above are satisfied.

Provided that the foregoing conditions are satisfied, Lender will disburse (within the period set forth in **Section 4.2(a)**), the amount of the Advance requested by Borrower, which amount will not exceed the difference between (A) the cost of construction work in place, disbursements for Stored Materials, if any, and any other costs, expenses and fees actually paid or payable by Borrower for approved Project Costs as of the date of the request for a disbursement, and (B) any required Retainage and any amounts previously disbursed hereunder. Notwithstanding the foregoing, Lender may, in its discretion, make disbursements of the Loan prior to Borrower's satisfying all of the conditions to the Initial Draw for the payment of, or reimbursement for, such Hard Costs and Soft Costs as are approved by Lender, provided that Borrower provides Lender with such documents and materials regarding such disbursements as Lender in its sole discretion may require.

(b)     Each disbursement for Direct Costs is subject to the Retainage, which will be disbursed upon satisfaction of the conditions in **Section 4.9**.

(c)     Lender will deposit the Loan proceeds in a deposit account maintained by Borrower with Lender designated for such purpose.

4.4     **Loan Balancing**.

(a)     As a material condition of the Loan and as a condition precedent to Lender's duty to disburse proceeds of the Loan, Borrower must pay all Project Costs in excess of the Loan Amount. Except for the payment of interest pursuant to **Section 4.5** and the payment of expenses, charges, costs and fees pursuant to **Section 8.10**, Lender is obligated to disburse proceeds of the Loan only when the Loan is "in balance". The Loan is "in balance" only at such times as Borrower has invested sufficient funds into the payment of Project Costs so that, in Lender's sole judgment, the undisbursed portion of the Loan is sufficient to complete and operate fully the Project and pay all Project Costs (including interest reserve) until repayment in full of the Loan.

4817-3213-1027

(b)     The determination as to whether or not the Loan is "in balance" may be made by Lender at any time, including with each request for a disbursement of the Loan.  Project Cost categories listed as "contingencies" on the Budget will be deemed to be Project Costs for purposes of loan balancing.

(c)     Borrower must within ten (10) days after notice from Lender that the Loan is not "in balance", deposit with Lender, in cash, the amount necessary to put the Loan "in balance".  No interest will be paid by Lender on such deposited funds.  Any amounts deposited by Borrower with Lender pursuant to this provision will be disbursed in accordance with the terms of this Agreement for the payment of Hard Costs and Soft Costs prior to any further disbursement of Loan funds.

4.5     **Reserved**.

4.6     **Foundation Endorsement**.  Upon completion of the construction of any foundation on the Premises, and as a condition precedent to any further disbursements under this Agreement provided that the Title Company can issue the requested foundation endorsement, Borrower must (if required by Lender), at Borrower's own cost and expense, deliver or cause to be delivered to Lender a foundation endorsement with respect to each such foundation, in form and substance reasonably satisfactory to Lender, to be attached to the Title Insurance Policy, which endorsement will insure that such foundation is within the boundary lines of the Premises, does not violate any applicable covenants, conditions, restrictions or agreements affecting the Premises which are referred to in the Title Insurance Policy, and does not encroach upon any easements, rights or rights-of-way affecting or covering the Premises.

4.7     **Loan Fee**.  Borrower must pay to Lender on the Closing Date the Loan Fee, which is now fully earned by Lender.  Borrower hereby authorizes Lender to disburse proceeds of the Loan to pay all or any portion of the Loan Fee notwithstanding that Borrower may not have requested a disbursement of such amount.  The authorization herein granted is irrevocable and no further direction or authorization from Borrower will be necessary to make such disbursement.  Any such disbursement will be added to the outstanding principal balance of the Note.

4.8     **Stored Materials**.

(a)     Lender has the right to approve or disapprove specifically, in its sole judgment, all disbursements for Stored Materials.  Without limiting Lender's approval rights as set forth in the preceding sentence, Lender will not approve disbursements for Stored Materials until Borrower complies with the conditions set forth in **Section 4.8(b)**.

(b)     As a condition precedent to the disbursement for Stored Materials, Borrower must supply to Lender: (i) evidence satisfactory to Lender that the Stored Materials are included in the coverage of the insurance policies required by **Section 6.19**; (ii) evidence satisfactory to Lender from the seller or fabricator of the Stored Materials that, upon payment, ownership thereof will vest in Borrower free of any liens or claims of third parties; (iii)(A) evidence satisfactory to Lender that the Stored Materials are satisfactorily stored on the Premises to protect against theft or damage, or (B) if the Stored Materials are not stored on the

15

Premises, (1) evidence satisfactory to Lender that the Stored Materials are stored in a bonded warehouse or storage yard approved by Lender, and the warehouse or yard has been notified that Lender has a security interest in the subject Stored Materials, and (2) Lender has received from Borrower the original warehouse receipt.  With Lender's prior written approval, Stored Materials may be stored in the yard or warehouse of the seller or fabricator, subject to satisfaction of conditions (i) and (ii) in this **Section 4.8(b)**, and provided further that Lender receives satisfactory evidence that the Stored Materials are protected against theft or damage, have been suitably identified as belonging to Borrower for use in the Project and that such seller or fabricator has been notified of the security interest of Lender therein.

4.9     **Retainage Under any Construction Contracts and the General Contract**. Retainage under a Construction Contract or the General Contract, as applicable, will be released upon Borrower's delivery of the requisition documents described in **Section 4.2** and Borrower's satisfaction of the conditions set forth in **Section 4.3** and the following applicable conditions:

(a)     With respect to any retainage under the General Contract, the Project is Substantially Complete.  Substantial Completion will be deemed to have occurred despite the existence of punch-list items that require correction or completion, as determined by the Lender and the Inspecting Architect and as approved by Lender; provided, however, that if punch-list items exist upon Substantial Completion, Lender will have the right to withhold an amount equal to one hundred fifty percent (150%) of the cost to complete all such punch-list items.  The punch-list holdback will be disbursed upon lien-free completion of the punch-list items and approval thereof by the Lender and the Inspecting Architect;

(b)     Lender has received (1) an Unconditional Lien Waiver and Release (upon progress payment) from the General Contractor, each Construction Contractor and each Subcontractor covering the full amount of the disbursement for Direct Costs through the date of the previous disbursement request, and (2) an Unconditional Lien Waiver and Release (upon final payment) from each Construction Contractor and each Subcontractor who had completed the work covered by its Construction Contract or Subcontract, respectively, as of the previous disbursement request, covering the full amount due such Construction Contractor or Subcontractor, as the case may be;

(c)     With respect to the final release of Retainage under the General Contract, Lender has received appropriate approvals from (1) all Governmental Authorities regarding completion of the shell and core of the Improvements, which approvals must be evidenced by an irrevocable certificate of occupancy for the Improvements to the extent such approval is a condition to the lawful use and occupancy; (2) the local board of fire underwriters or its equivalent; and (3) all other Governmental Authorities having jurisdiction over the contemplated uses, operation and occupancy of the Project;

(d)     Borrower has submitted to Lender copies of all licenses, permits and agreements necessary for the use, operation and occupancy of the Project not previously delivered to Lender;

(e)     If required by Lender, Borrower has provided to Lender, an ALTA as-built survey or other satisfactory evidence showing that (i) the Improvements have been built in

accordance with the Plans and Specification and do not encroach on any easement or public or private right of way, (ii) the Improvements have been constructed within the boundaries of the Premises; and (iii) the Improvements have been constructed within the setback lines as required by applicable zoning ordinances and do not encroach upon any other lot or other property;

(f)     Borrower has provided to Lender "as-built" Plans and Specifications of the Improvements, showing the final specifications of all Improvements;

(g)     If required by Lender, Borrower has provided to Lender a warranty book, together with all guaranties and maintenance agreements, etc., on all Improvements;

(h)     If required by Lender, Borrower has provided to Lender executed AIA Form G706 (Contractor's Affidavit of Payments of Debts), AIA Form G706A (Contractor's Affidavit of Release of Liens), and AIA Form G707 (Consent of Surety of Final Payment);

(i)     If required by Lender, Borrower has provided to Lender executed AIA Form G704 or other document satisfactory to Lender by the Inspecting Architect, the General Contractor and Borrower;

(j)     If requested by Lender, a notice of completion on Lender's approved form executed by Borrower and duly recorded in the Official Records of the County;

(k)     Borrower has provided to Lender satisfactory evidence of continuing insurance coverage in accordance with **Section 6.19**;

(l)     Borrower submits a certified copy of the final project report as prepared by the architect/engineer providing final inspection for the Project; and

(m)     Such other documentation, including, but not limited to, endorsements to the Title Insurance Policy, as Lender may reasonably require.

4.10     **Reserves**.  In addition to any reserves for specific line items that are already established in the Budget, Lender may establish and set aside out of the undisbursed proceeds of the Loan, reserves (collectively, the "Loan Reserves") in such amounts as may be reasonably estimated by Lender from time to time to provide for payment of the items of Project Cost as the same may accrue or become payable prior to the repayment in full of the Loan.  Amounts set aside as Loan Reserves shall not be available for disbursement to Borrower for any purpose other than payment of the item or group or items for which the Loan Reserve was established.  Based upon the facts then available to Lender, Lender may adjust and reallocate the amount of any Loan Reserves from time to time.  Items for which Loan Reserves may be established shall include (i) Loan Expenses, (ii) interest on the Loan, (iii) real estate taxes and assessments, (iv) premiums on insurance policies and bonds (if any) required to be furnished by Borrower hereunder, (v) contingencies, (vi) construction and soft cost contingencies, (vii) lease-up deficit, and (viii) capital reserves.  Borrower hereby acknowledges that Lender has established and set aside out of the Loan, an interest reserve (the "Interest Reserve") in the amount of $1,442,997.00 for the payment of interest on the Loan as the same may accrue or become payable prior to the repayment in full of the Loan.  Amounts set aside as the Interest Reserve shall not be available for disbursement to Borrower for any purpose other than payment of interest.  Disbursement of

17

the Interest Reserve shall be made to pay the interest on the Loan from the Closing Date until Extended Term.  Interest Reserves shall be fully earned by Lender at Closing. Notwithstanding anything to the contrary contained herein, Borrower shall not be required to pay interest on the Interest Reserve unless funds are disbursed from such Interest Reserve to Borrower.  Further, Borrower shall be required to establish a certain reserve account (the "Replacement Reserve") for capital expenditures and expenses.  Commencing on the Completion Date, Borrower shall fund the Replacement Reserve by making monthly deposits (no later than the tenth (10th) day of each month/) to such account equal to an amount mutually agreed to by Lender and Borrower upon the establishment of the Replacement Reserve.  Amounts set aside as the Replacement Reserve shall not be available for disbursement to Borrower for any purpose other than as set forth herein, and prior to any proposed disbursement from the Replacement Reserve, Borrower shall provide evidence reasonably sufficient to Lender that such proposed disbursement is in compliance with this Agreement.  Further,  Borrower shall be required to establish an escrow account with Lender for property taxes and Insurance (the "Tax and Insurance Escrow") and Borrower agrees to begin funding said escrow account on a monthly basis upon Construction Completion by remitting payment to Lender on monthly basis (on the same date on which regular payments of interest or principal and interest, as the case may be, are due under the Note) in an amount equal to 1/12 of the estimated property taxes and insurance for the Premises as determined by Lender in its reasonable discretion.  Further, if Lender reasonably determines that Borrower is not maintaining the Premises as required herein, in addition to all of Lender's other remedies, Lender may require Borrower to pay into a non-interest bearing reserve account (the "Maintenance Reserve Account") an amount reasonably estimated by Lender to be sufficient to enable Borrower to maintain the Premises  If required by Lender, such amount shall be payable in advance on the day monthly installments are payable under the Note and in addition to any other sums due under the Indebtedness and shall be subject to adjustment, up or down, annually on the anniversary of the date hereof by Lender in Lender's reasonable discretion.  The Maintenance Reserve Account shall be under Lender's sole control.  The Maintenance Reserve Account and all funds on deposit therein shall be additional security for the Indebtedness. Lender shall make disbursements from the Maintenance Reserve Account for maintenance of the Premises, or as otherwise provided by this Loan Agreement, at Lender's sole discretion; provided however that, so long as no Event of Default exists, Lender will not unreasonably withhold reimbursement to Borrower out of the Maintenance Reserve Account for amounts expended by it to maintain the Premises in the manner reasonably acceptable to Lender.

5.     **REPRESENTATIONS AND WARRANTIES**

5.1     **Consideration**.  As an inducement to Lender to execute this Agreement and to disburse the proceeds of the Loan, Borrower represents and warrants to Lender that the following statements set forth in this **Article 5** are true, correct and complete as of the date hereof to Borrower's actual knowledge, without duty of inquiry or investigation, and will be true, correct and complete to Borrower's actual knowledge, without duty of inquiry or investigation, as of the Closing Date.

5.2     **Organization, Powers and Good Standing**.

(a)     **Organization and Powers**.  Borrower is a limited liability company, duly organized and validly existing under the laws of the State of Colorado and is qualified to

18

transact business in the State of Colorado.  Borrower has all requisite power and authority, rights and franchises to own and operate its properties, to carry on its businesses as now conducted and as proposed to be conducted, and to enter into and perform this Agreement and the other Loan Documents.  Borrower's correct legal name is "Mighty Argo Cable Car LLC" and its Colorado Corporation Commission file number is 20191868056. The address of the Borrower's principal office street address is 1431 Miner Street, Idaho Springs, Colorado 80452.

        (b)    **Good Standing**.  Borrower has made all filings and is in good standing in the State of Colorado and in each other jurisdiction in which the character of the property it owns or the nature of the business it transacts makes such filings necessary or where the failure to make such filings could have a materially adverse effect on the business, operations, assets or condition (financial or otherwise) of Borrower.

        (c)    **Non-Foreign Status**.  Borrower, or if Borrower is a disregarded entity as defined in Treasury Regulation §1.1445-2(b)(2)(iii), the owner of the disregarded entity, is not a "disregarded entity", "foreign corporation", "foreign partnership", "foreign trust", or "foreign estate", as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder.  Borrower's or such owner's U.S. employer identification number is as set forth in the Certification of Non-Foreign Status.

    5.3    **Authorization of Loan Documents**.

        (a)    **Authorization**.  The execution, delivery and performance of the Loan Documents by Borrower are within Borrower's powers and have been duly authorized by all necessary action by Borrower.

        (b)    **No Conflict**.  The execution, delivery and performance of the Loan Documents by Borrower will not violate (i) Borrower's articles of organization and operating agreement; (ii) any legal requirement affecting Borrower or any of its properties; or (iii) any agreement to which Borrower is bound or to which it is a party and will not result in or require the creation (except as provided in or contemplated by this Agreement) of any lien upon any of such properties.

        (c)    **Governmental and Private Approvals**.  All governmental or regulatory orders, consents, permits, authorizations and approvals required for the construction, use, occupancy and operation of the Improvements have been or will be obtained and are or will be in full force and effect.  No additional governmental or regulatory actions, filings or registrations with respect to the Improvements, and no approvals, authorizations or consents of any trustee or holder of any indebtedness or obligation of Borrower are required for the due execution, delivery and performance by Borrower of the Loan Documents.

        (d)    **Binding Obligations**.  This Agreement and the other Loan Documents have been duly executed by Borrower, and are legally valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

5.4     **No Material Defaults**.  There exists no material violation of or material default by Borrower and, to the best knowledge of Borrower, no event has occurred which, upon the giving of notice or the passage of time, or both, would constitute a material default with respect to (a) the terms of any instrument evidencing or securing any indebtedness of Borrower, (b) any lease or other agreement affecting the Project, (c) any license, permit, statute, ordinance, law, judgment, order,  writ, injunction, decree, rule or regulation of any Governmental Authority, or any determination or award of any arbitrator to which Borrower or the Project may be bound, or (d) any mortgage, instrument, agreement or document by which Borrower, or any of its properties is bound.

5.5     **No Material Adverse Change**.  No Material Adverse Change has occurred.

5.6     **Litigation;  Adverse  Facts**.      There  is  no  action,  suit,  investigation, proceeding or arbitration (whether or not purportedly on behalf of the Borrower) at law or in equity or before or by any foreign or domestic court or other governmental entity (a "**Legal Action**"), pending or, to the knowledge of Borrower, threatened against or affecting Borrower or any of its assets which could reasonably be expected to result in any Material Adverse Change in the business, operations, assets (including the Project) or condition (financial or otherwise) of Borrower or would materially and adversely affect Borrower's ability to perform its obligations under the Loan Documents.  There is no basis known to Borrower for any such action, suit or proceeding.  Borrower is not (a) in violation of any applicable law which violation materially and adversely affects or may materially and adversely affect the business, operations, assets (including the Project) or condition (financial or otherwise) of Borrower, (b) subject to, or in default with respect to any other legal requirement that would have a materially adverse effect on the business, operations, assets (including the Project) or condition (financial or otherwise) of Borrower, or (c) in default with respect to any agreement to which Borrower is a party or to which it is bound, which default materially and adversely affects or may materially and adversely affect the business, operations, assets or condition (financial or otherwise) of Borrower or the Project.  There is no Legal Action pending or, to the knowledge of Borrower, threatened against or affecting Borrower questioning the validity or the enforceability of this Agreement or any of the other Loan Documents.

5.7     **Title to Properties; Liens**.  Borrower has good, sufficient and legal title to all properties and assets reflected in its most recent balance sheet delivered to Lender, except for assets disposed of in the ordinary course of business since the date of such balance sheet. Borrower is the sole owner of, and has good and marketable title to the fee interest in the Premises, the Improvements, and all other real property described in the Deed of Trust, free from any adverse lien, security interest or encumbrance of any kind whatsoever, excepting only (a) liens and encumbrances shown on the Preliminary Title Report, (b) liens and security interests in favor of Lender, and (c) other matters which have been approved in writing by Lender.

5.8     **Disclosure**.  There is no fact known to Borrower that materially and adversely affects the business, operations, assets or condition (financial or otherwise) of Borrower which has not been disclosed in this Agreement or in other documents, certificates and written statements furnished to Lender in connection herewith.

20

5.9     **Payment of Taxes**.  All tax returns, extension filings, and reports of Borrower required to be filed by Borrower have been timely filed, and all taxes, assessments, fees and other governmental charges upon Borrower and upon its properties, assets, income and franchises which are due and payable have been paid when due and payable.  Borrower knows of no proposed tax assessment against it that would be material to the condition (financial or otherwise) of Borrower, and Borrower has not contracted with any government entity in connection with such taxes.

5.10     **Securities Activities**.  Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock (as defined within Regulations G, T and U of the Board of Governors of the Federal Reserve System), and not more than twenty-five percent (25%) of the value of Borrower's assets consists of such margin stock.  No part of the Loan will be used to purchase or carry any margin stock or to extend credit to others for that purpose or for any other purpose that violates the provisions of Regulations U or X of said Board of Governors.  No portion of the Loan may be used directly or indirectly to purchase ineligible securities, as defined by applicable regulations of the Federal Reserve Board, underwritten by any affiliate of Lender during the underwriting period and for thirty (30) days thereafter.

5.11     **Government Regulations**.  Borrower is not subject to regulation under the Investment Company Act of 1940, the Federal Power Act, the Public Utility Holding Company Act of 1935, the Interstate Commerce Act or to any federal or state statute or regulation limiting its ability to incur indebtedness for money borrowed.

5.12     **Rights to Project Agreements, Permits and Licenses**.  Borrower is the true owner of all rights in and to all existing agreements, permits and licenses relating to the Project, and will be the true owner of all rights in and to all future agreements, permits and licenses relating to the Project.  Borrower's interest in all such agreements, permits and licenses is not subject to any present claim (other than under the Loan Documents or as otherwise approved by Lender in its discretion), set-off or deduction other than in the ordinary course of business.

5.13     **Utilities and Access**.  Telephone services, electric power, storm sewers, sanitary sewer, potable water facilities and all other utilities and services necessary for the construction, use, operation and maintenance of the Improvements are available or will be available to the Premises, are or will be adequate to serve such improvements, and are not subject to any conditions limiting the use of such utilities, other than normal charges to the utility supplier.  All streets and easements necessary for the operation and maintenance of the Improvements are or will be available to the boundaries of the Premises.

5.14     **Compliance with Laws**.  The Improvements and the Premises, and the uses to which the Improvements and the Premises are and will be put, comply fully with such applicable laws and restrictive covenants.

5.15     **Financial Condition**.  The financial statements and all financial data previously delivered to Lender in connection with the Loan and/or relating to Borrower and Guarantor are true, correct and complete in all material respects. Such financial statements comply with the requirements of **Section 6.12** and fairly present the financial position of the parties who are the

21

subject thereof as of the date thereof.  No Material Adverse Change has occurred in such financial position and, except for this Loan, no borrowings have been made by Borrower since the date thereof.

5.16    **Personal Property**.  Borrower is now and will continue to be the sole owner of the Collateral free from any adverse lien, security interest or adverse claim of any kind whatsoever, except for liens or security interests in favor of Lender.

5.17    **No Condemnation**.  No condemnation proceedings or moratorium is pending or, to Borrower's knowledge, threatened against the Project or the Premises (or any portion thereof) which would impair the use, occupancy or full operation of the Project in any manner whatsoever.

5.18    **Other Loan Documents**.  Each of the representations and warranties of Borrower contained in any of the other Loan Documents is true and correct in all material respects.  All of such representations and warranties are incorporated herein for the benefit of Lender.

5.19    **Lender Knowledge**. In the event that the Lender actually knows that Borrower is in default of any of the representations and warranties described in this Article 5 prior to the Closing Date and otherwise proceeds to close on the Loan, Borrower or Guarantor shall not be deemed in default under the Loan Documents.

6.    **COVENANTS OF BORROWER**

6.1    **Consideration**.  As an inducement to Lender to execute this Agreement and to make each disbursement of the Loan, Borrower hereby covenants as set forth in this **Article 6**, which covenants will remain in effect so long as the Note remains unpaid.

6.2    **No Encumbrances**.  Borrower will not permit any lien, levy, attachment or restraint to be made or filed against the Project, or any portion thereof, or permit any receiver, trustee or assignee for the benefit of creditors to be appointed to take possession of the Project or any portion thereof, except for lien claims filed or asserted against the Premises or the Project and concerning which Borrower is in full compliance with the provisions of **Section 6.10**. Borrower will not encumber the Project or any portion thereof or any personal property owned by it and used in connection with the use, occupancy or operation of the Project in any way, including the Collateral, without the prior written consent of the Lender.

6.3    **Compliance with Laws**.  Borrower will comply and, to the extent it is able, will require others to comply with all laws and requirements of all Governmental Authorities having jurisdiction over the Premises or construction of the Improvements and will furnish Lender with reports of any official searches for violation of any requirements established by such Governmental Authorities.  Borrower will comply and, to the extent it is able, will require others to comply with applicable CC&Rs and all restrictive covenants and all obligations created by private contracts and leases which affect ownership, construction, equipping, fixturing, use or operation of the Project.  The Improvements, when completed, will comply with all applicable building, zoning and use laws, requirements, regulations and ordinances and will not violate any restrictions of record against the Premises or the terms of any lease of all or any portion of the Premises.

6.4     **Lender Inspections**.   Throughout the term of the Loan and during normal business hours, subject to the rights of the General Contractor and upon not less than twenty four (24) hours written notice, Borrower will permit Lender and Lender's representatives, inspectors and consultants to enter upon the Premises, to inspect the Improvements and materials to be used therein, to audit, examine and copy all contracts, records (including, but not limited to, financial and accounting records pertaining to the Loan or the Project), plans and shop drawings which are kept at the construction site or at Borrower's offices, and to discuss the affairs, finances and accounts of Borrower with representatives of Borrower.   Borrower will cooperate with and will cause the General Contractor, Construction Contractors and Subcontractors to cooperate with any such representatives, inspectors or consultants retained by Lender pursuant to **Section 8.9** to enable them to perform their functions under this Agreement.   Borrower will have the General Contractor maintain and make available for inspection by Lender or its representatives on demand, daily log sheets covering the period since the immediately preceding inspection, which log sheets shows dates, weather conditions, number of workers, Construction Contractors and Subcontractors on the job and the progress of construction. The inspection fee amount as set forth in the Approved Budget is non-refundable and shall be fully earned by Lender at Closing.

6.5     **Commence and Continue Construction**.

(a)     **Except as otherwise disclosed to Lender, Borrower represents and warrants that construction of the Improvements has not begun and covenants that construction of the Improvements will commence promptly following the Closing Date** and will continue with diligence and continuity, as determined by Lender in its reasonable discretion, in compliance with the Construction Schedule, in order that Substantial Completion of the Improvements will occur on or before the Completion Date.

(b)     Subject to the provisions of **Section 6.10**, all construction must be free and clear of defects in and liens or claims for liens for materials supplied or labor or services performed in connection with the Improvements.   The Improvements must be in substantial conformity with the Plans and Specifications and, except for off-site improvements designated thereon, must be contained wholly within the lot lines of the Premises and will not encroach on any other real estate, easements, building lines or set-back requirements.

6.6     **Ownership of Personal Property**.   Borrower will be the sole owner of all Collateral related to the Project acquired after the date hereof, free from any adverse lien, security interest or adverse claim of any kind whatsoever, except for security interests and liens in favor of the interest of a lessor pursuant to a lease of personal property approved by Lender and the liens and security interests approved by Lender pursuant to **Section 6.2**.

6.7     **Correction of Defects**.   Within five (5) days after notice thereof, Borrower will proceed with diligence to correct all defects in the Improvements and any departure from the Plans and Specifications except as approved by Lender or permitted under **Section 6.8**.   The disbursement of any Loan proceeds will not constitute a waiver of Lender's right to require compliance with this covenant with respect to any such defect or departure from the Plans and Specifications.

23

6.8   **Changes and Change Orders**.

(a)   Borrower will not change or in any manner cause or seek a change in any laws, requirements of Governmental Authorities and obligations created by private contracts and leases which now or hereafter may significantly affect the ownership, construction, equipping, fixturing, use or operation of the Project without the prior written consent of Lender.

(b)   Any Change Order must be submitted to Lender for review and approval. Borrower will not, without the prior written approval of Lender, which approval shall not be unreasonably withheld, delayed, or conditioned, permit the performance of any work pursuant to, or request a disbursement for, any Change Orders which result in a material change in the Plans and Specifications, Construction Schedule, General Contract or any Construction Contract or will increase Project Costs.  Proposed Change Orders requiring Lender's approval must be submitted to Lender on a form acceptable to Lender containing such information as to the nature, scope and cost for such change as Lender may require together with a marked copy of the portion of the Plans and Specifications affected by the proposed change.

(c)   Notwithstanding the provisions of this **Section 6.8**, but subject to **Section 6.9**, Borrower is not be required to obtain Lender's consent to any individual Change Order of  $25,000.00 or less, paid from the contingency budget or reallocated from other budget line items with Lender's approval.

6.9   **Changes in Cost of Contracts**.  Borrower will not agree to any increases in the cost or amount of the General Contract or any Construction Contract without Lender's prior written consent.

6.10   **Contesting Liens**.

(a)   Borrower will promptly discharge or cause to be discharged any mechanics' or materialmen's liens or claims of lien filed or otherwise asserted against the Premises, the Improvements, the Project or any funds due the General Contractor or any Construction Contractor and any proceedings for the enforcement thereof; provided, however, that Borrower has the right to contest in good faith and with reasonable diligence the validity of any such liens or claims upon furnishing to the Title Company such security, bond, surety, or indemnity as the latter may require to induce it to issue its Title Insurance Policy or an interim endorsement thereto insuring against all such claims or liens and, provided further, that Lender will not be required to make any further disbursements of the Loan until all such mechanics' or materialmens' liens or claims of lien shown on the title insurance commitment or any interim endorsement have been bonded around or so insured against by the Title Company to Lender's reasonable satisfaction.

(b)   If (i) Borrower fails either to promptly discharge  or contest liens or claims of lien and provide the security or indemnity in the manner provided in **Section 6.10(a)** or (ii) after having complied with the provisions of **Section 6.10(a)** there is an adverse conclusion to any such contest and Borrower does not cause any final judgment or decree to be immediately satisfied and the lien to be discharged, then Lender may, but will not be required to, procure the release and discharge of any such lien and any judgment or decree thereon, and in furtherance

24

thereof may, in its sole discretion, effect any settlement or compromise or furnish any security or indemnity as may be required by the Title Company. All amounts expended by Lender in connection with the provisions of this **Section 6.10(b)** will be deemed to constitute a disbursement of the Loan. In settling, compromising or arranging for the discharge of any liens under this **Section 6.10(b)**, Lender will not be required to establish or confirm the validity or amount of the lien.

6.11 **Compliance with Loan Documents**. Borrower will comply with all conditions of this Agreement, whether or not a disbursement of the Loan is requested. It will comply and, to the extent it is able, will cause compliance by parties thereto, with all other Loan Documents and with the General Contract and the Construction Contracts.

6.12 **Financial Statements and Reports**.

(a) As soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year of Borrower, Borrower must furnish to Lender a copy of the Borrower-prepared financial statements of Borrower for such period, in form and substance reasonably satisfactory to Lender (together with the comparable figures for the previous fiscal year) and must also provide Lender with such other information respecting the condition of Borrower and the Project as Lender may from time to time reasonably request.

(b) As soon as available, and in any event within ninety (90) days after the end of each interim quarterly accounting period of Borrower, Borrower must furnish to Lender a copy of the Borrower-prepared current financial statements of Borrower for such period and for the Borrower's fiscal year to date, in form and substance reasonably satisfactory to Lender (together with the comparable figures for the previous fiscal year).

(c) As soon as available, and in any event within thirty (30) days of the date filed (including any extensions thereof) with the Internal Revenue Service, Borrower must furnish to Lender complete copies of the annual federal income tax returns of Borrower, together with all schedules and K-1s attached thereto.

(d) As soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year of each entity Guarantor, Borrower must furnish or cause to be furnished to Lender a copy of the company-prepared financial statements of Guarantor, in form and substance reasonably satisfactory to Lender (together with the comparable figures for the previous fiscal year) and must also provide Lender with such other information respecting the condition of such Guarantor as Lender may from time to time reasonably request.

All financial statements must be in reasonable detail, prepared in accordance with generally accepted accounting principles consistently applied throughout the period involved and, in the case of audited, compiled, or reviewed statements, with generally accepted auditing standards. All financial statements required pursuant hereto must be certified to by the duly authorized officer of the subject of such statements. If the statement is audited, compiled, or reviewed by a certified public accountant, such statement must be certified as having been audited, compiled, or reviewed by a certified public accountant satisfactory to Lender. To the extent required by Lender, together with such financial statements, Borrower will deliver to Lender: Borrower's

certificate, certified by an authorized officer thereof, stating that there exists no Event of Default and no act or event which with notice and/or lapse of time would become an Event of Default or, if any such condition exists, specifying the nature and period of existence thereof and what action Borrower proposes to take with respect thereto.

6.13    **Representations and Warranties**.  Until repayment of the Note and all other obligations secured by the Deed of Trust, the representations and warranties of **Article 5** will remain true and complete in all material respects.

6.14    **Trade Names**.  Borrower will immediately notify Lender in writing of any change in the legal, trade or fictitious business names  used by Borrower and will, upon Lender's request, execute any additional financing statements and other certificates necessary to reflect the change in trade names or fictitious business names.

6.15    **Further Assurances**.  Borrower will authorize, execute, and deliver from time to time, promptly after any request therefor by Lender, any and all instruments, agreements and documents and will take such other action as may be necessary or desirable in the opinion of Lender to maintain, perfect or insure Lender's security provided for herein and in the other Loan Documents, including, without limitation, the authorization of UCC-1 renewal statements, the execution of such amendments to the Deed of Trust and the other Loan Documents and the delivery of such endorsements to the Title Insurance Policy, all as Lender reasonably requires, and Borrower will pay all fees and expenses (including reasonable attorneys' fees) related thereto.  Promptly upon the request of Lender, Borrower will execute and deliver a Certification of Non-Foreign Status.

6.16    **Notice of Litigation**.  Promptly following Borrower's receipt of notice of the following, Borrower will give, or cause to be given, prompt written notice to Lender of (a) any action or proceeding which is instituted by or against it in any Federal or state court or before any commission or other regulatory body, Federal, state or local, foreign or domestic, or any such proceedings which are threatened against it which, if adversely determined, could have a material and adverse effect upon its business, operations, properties, assets, management, ownership or condition of Borrower (financial or otherwise), (b) any other action, event or condition of any nature which may have a material and adverse effect upon its business, operations, management, assets, properties, ownership or condition of Borrower (financial or otherwise), or which, with notice or lapse of time or both, would constitute an Event of Default or a default under any other contract, instrument or agreement to which it is a party or to which it or any of its properties or assets may be bound or subject, and (c) any actions, proceedings or notices adversely affecting the Project or Lender's interest therein by any zoning, building or other municipal officers, offices or departments having jurisdiction with respect to the Project.

6.17    **Tenant Leases; SNDAs; Lease Termination Fees**.

(a)    **Compliance with Tenant Leases**.  Borrower will not breach any representation or warranty contained in any Tenant Lease.  Borrower will perform all of its covenants and obligations under each Tenant Lease.  Borrower will not take any action or omit to take any action which would permit the termination of any Tenant Lease.  Borrower agrees to promptly notify Lender in writing of any default or alleged default by any party to any Tenant

Lease and to deliver to Lender copies of all notices, demands, complaints or other communications received or given by Borrower with respect to such default or alleged default. Lender will have the right but not the obligation to cure any default and to perform any or all of Borrower's obligations under any Tenant Lease. All sums expended by Lender in curing any such default will be secured by the Deed of Trust, will be immediately due and payable without demand or notice and will bear interest from date of expenditure at the Default Interest Rate.

(b) **Approval of Tenant Leases**. All Tenant Leases executed after the date hereof, unless otherwise approved by Lender in writing, must be in the Standard Lease Form. Lender has the right to approve or disapprove, in Lender's sole discretion, each Tenant Lease executed after the date hereof (and the Tenant thereunder) which covers more than 2,500 net rentable square feet of the Improvements. Lender will approve or disapprove any Tenant Lease requiring Lender's approval within ten (10) Business Days of receipt by Lender of the lease and all other information reasonably deemed necessary by Lender in connection with its approval of the lease. If Lender fails to approve or disapprove any lease within such ten (10) Business Day period, the lease will be deemed approved. Borrower will, within ten (10) days after a request therefor, deliver to Lender an estoppel certificate, in form and substance satisfactory to Lender, from such tenant or tenants as Lender may specify. Within ten (10) days after the execution thereof, Borrower will deliver to Lender copies of all leases deemed approved by Lender pursuant to the provisions of this **Section 6.17**. Any amendment to any Approved Tenant Lease which include changes in the Tenant Lease which are adverse to the Landlord thereunder, will be submitted to Lender prior to the execution thereof. The provisions of this **Section 6.17** with regard to the time on which Lender must approve or disapprove any Tenant Lease will govern the approval or disapproval of any such amendment.

(c) **SNDA's**. Within ten (10) days after the execution thereof, Borrower will deliver to Lender Subordination, Non-Disturbance, and Attornment Agreements, in form and substance reasonably satisfactory to Lender, signed by each Tenant who executes a Tenant Lease after the date hereof.

(d) **Termination Fees**. In the event that any Tenant Lease includes a provision permitting the Tenant to terminate the Tenant Lease upon payment of a lease termination fee, however such fee is described in the Tenant Lease, Borrower must give written notice to Lender of the exercise by the Tenant of such termination right, and if the termination fee exceeds $5,000, at Lender's written request, Borrower must apply the termination fee to the prepayment in part of the outstanding principal balance of the Loan.

6.18 **Amendments to Formation Documents**. Borrower will not allow any amendments to be made in the terms of the Borrower's Articles of Organization or Borrower's Operating Agreement without Lender's prior written consent.

6.19 **Insurance Requirements**. At all times throughout the Loan term, including the Construction Period, Borrower must, at its sole cost and expense, maintain insurance, and must pay, as the same becomes due and payable, all premiums in respect thereto, including, but not necessarily limited to:

27

(a)     **Property**.  Insurance against loss or damage by fire, lightning and other perils, on an all risk basis, such coverage to be in an amount not less than the full insurable value of the Improvements on a replacement cost basis.  During the Construction Period, such policy must be written in the so-called "Builder's Risk Completed Value Non-Reporting Form", on an all-risk basis, with no co-insurance requirement, and must contain a provision granting the insured permission to complete and/or occupy.

(b)     **Liability**.  Insurance protecting the Borrower and Lender against loss or losses from liability imposed by law or assumed in any written contract and arising from personal injury, including bodily injury or death, or a limit of liability of not less than $1,000,000.00 (combined single limit for personal injury and property damage) and an umbrella excess liability policy in an amount not less than $3,000,000.00 protecting the Borrower and Lender against any loss or liability or damage for personal injury, including bodily injury or death, or property damage.  Such policies must be written on an occurrence basis so as to provide blanket contractual liability, broad form property damage coverage, and coverage for products and completed operations.

(c)     **Business Interruption**.  Business interruption insurance (extra expense/loss of income insurance) in an amount sufficient to cover any loss of income from the Project in an amount of not less than actual income loss for a period of twelve (12) months.  This coverage must be in effect from the date of Substantial Completion of the Project.

(d)     **Flood**.  If the Premises, or any part thereof, lies within a "special flood hazard area" as designated on maps prepared by the U.S. Department of Housing and Urban Development, a National Flood Insurance Association standard flood insurance policy, plus insurance from a private insurance carrier if necessary, for the duration of the Loan in the amount of the full insurable value of the Improvements.

(e)     **Contractor**.  The General Contractor will be required to carry liability insurance of the type and providing the minimum limits set forth below:

(i)     Workman's compensation insurance, disability benefits insurance and each other form of insurance which the General Contractor is required by law to provide, covering loss resulting from injury, sickness, disability or death of employees of the General Contractor who are located on or assigned to the Project.

(ii)     Comprehensive general liability insurance on an occurrence basis providing coverage for:

Premises and Operations
Products and Completed Operations
Blanket Contractual Liability
Personal Injury Liability
Broad Form Property Damage
        (including completed operations)
Explosion Hazard

28

Collapse Hazard
Underground Property Damage Hazard

Such policy must have a limit of liability of not less than $3,000,000.00 (combined single limit for personal injury, including bodily injury or death, and property damage).

(iii)     Business auto liability including all owned, non-owned and hired autos with a limit of liability of not less than $1,000,000.00 (combined single limit for personal injury, including bodily injury or death, and property damage).

(iv)     Excess "umbrella" liability providing liability insurance in excess of the coverages in (i), (ii) and (iii) above with a limit of not less than $5,000,000.00.

(f)     **Architect**.  During the Loan term, and if requested by Lender, the architect will be required to provide architect's or engineer's professional liability insurance with a limit of liability of not less than $50,000.00, or such other amount as may be acceptable to Lender.

(g)     **Engineer**.  During the Loan term, and if requested by Lender, the soils engineer or environmental contractor will be required to provide engineer's professional liability insurance with a limit of liability of not less than $50,000.00 or such other amount as may be acceptable to Lender.

(h)     **Other**.  All insurance policies must (i) be issued by an insurance company having a rating of "A-VIII" or better by A.M. Best Co., in Best's Rating Guide, (ii) name Lender as an additional insured on all liability insurance and as mortgagee and lender loss payable on all casualty insurance, (iii) provide that Lender is to receive thirty (30) days written notice prior to non-renewal or cancellation, (iv) be evidenced by a certificate of insurance to be held by Lender, and (v) be in form and amounts acceptable to Lender.

(i)     **Evidence**.  All such policies of insurance, or certificates of insurance evidencing that such insurance is in full force and effect, must be delivered to Lender on or before the Closing Date (together with proof of the payment of the premiums thereof).  At least thirty (30) days prior to the expiration of each such policy, Borrower must furnish Lender evidence that such policy has been renewed or replaced in the form of a certificate reciting that there is in full force and effect, with a term covering at least the next succeeding calendar year, insurance hereof of the types and in the amounts required.

6.20   **Maintenance of Existence**.  Borrower must maintain and preserve its existence and all rights and franchises material to its business.

6.21   **Construction Materials**.  Borrower will not use, and will not permit the use of, any Hazardous Material (as defined in the Environmental Indemnity) in the construction of the Improvements.

29

6.22 **Appraisals**. If deemed reasonably necessary by Lender or if required by law, Lender has the right to order Appraisals of the Project from time to time from an appraiser selected by Lender, which Appraisals comply with all federal and state standards for Appraisals and otherwise be satisfactory to Lender in all respects. Borrower agrees to pay the cost and expense for all Appraisals and reviews thereof ordered by Lender pursuant to this paragraph. Notwithstanding the foregoing, following the Closing Date, except if ordered upon the occurrence of an Event of Default, an Unmatured Event of Default and/or to the extent that an Appraisal is required by any law, rule or regulation applicable to Lender, Borrower shall not be required to pay for the cost and expense of more than one (1) Appraisal and review thereof during any consecutive twelve (12) month period during the term of the Loan.

6.23 **Verification of Costs**. At Lender's request, Borrower agrees to provide Lender with copies of all contracts, subcontracts and other agreements relating to the Project so that Lender can verify all costs set forth in the Budget, which contracts, subcontracts and other agreements will be subject to Lender's review and approval. Based on its review and verification of costs set forth in the Budget, Lender will have the reasonable right to reduce the dollar amount of any line items in the Budget or reallocate between line items in the Budget provided Lender does not materially interfere with Borrower's obligations under the Loan Documents.

6.24 **Stop Notices**.

(a) **General**. Borrower will not cause or permit any "stop notice" or similar notice to be filed or served on Lender with respect to the Premise. Borrower must defend, indemnify and hold Lender and its officers, directors, agents and employees harmless from and against all claims, damages, loss, liability, costs and expenses (including reasonable attorneys' fees and internal costs) arising from or relating to any such stop notice, the compliance therewith and the defense thereof. Lender may require Borrower to provide a release bond for any stop notice, which bond will be subject to Lender's review and approval and/or may take such action with respect to any stop notice as Lender may deem appropriate in Lender's sole and absolute discretion and Lender may withhold such amounts from disbursement in connection with the Loan as Lender may elect in Lender's sole and absolute discretion, and whether or not Lender is obligated to withhold funds pursuant to applicable law or any demands made in connection with any stop notice.

(b) **Notices**. Borrower irrevocably appoints Lender as its attorney-in-fact, coupled with an interest and with full power of substitution, to file for record, at the Borrower's cost and expense and in Borrower's name, any notices of completion, notices of cessation of labor, or any other notices that Lender considers necessary or desirable to protect its security.

(c) **Construction Contracts**. At Lender's request, Lender may require that construction of any site improvements be set forth in a separate construction contract and not included in any other construction contract for non-site improvements.

(d) **Loan Balancing**. With respect to any Loan "balancing" set forth herein or in the Loan Documents, any Loan funds which are subject to any stop notice or which Lender

30

has determined to withhold from disbursement will be excluded from any calculation of available Loan funds under the Loan.

6.25 **Financing Statements**.   By executing this Agreement, Borrower authorizes Lender to file any and all Uniform Commercial Code financing statements in the appropriate jurisdiction(s) as may be required to perfect the security interests of Lender in and to all personal property collateral securing the Loan as contemplated by this Agreement and the Loan Documents.

6.26 **Transfers**.  Borrower will not participate in or permit a Transfer, other than the Permitted Exceptions, without the prior written consent of Lender. Borrower will not transfer any assets into an asset protection trust or an irrevocable trust while any indebtedness is owing to Lender, without Lender's prior written consent.

6.27 **Financial Covenants of Borrower**.

(a) **Debt Service Coverage**.   Commencing on ninety (90) days after a certificate of occupancy is issued or Operations commence, whichever occurs first, and continuing through the remaining term of the Loan, the Project must maintain at all times a Debt Service Coverage Ratio of not less than 1.25 to 1.00, which covenant will be tested by Lender at the end of each calendar quarter based upon the financial statements of Borrower delivered to Lender pursuant to **Section 6.12**.  In the event the Project fails to satisfy the foregoing covenant, Borrower must immediately reduce the unpaid principal balance of the Loan, in an amount sufficient to increase the Debt Service Coverage Ratio to be at or above said ratio.

6.28 **Restrictions On Distributions**.   Borrower shall not make any distributions, loans, repayments of member loans, returns of capital contributions, payment of developer, management or other fees, except in accordance with **Section 6.32**, or any other payments to its members and/or any Affiliates, until the Loan is repaid in full. Notwithstanding the foregoing, distributions will be permitted provided: (i) Borrower has achieved a Debt Service Coverage Ratio of not less than 1.25 to 1.00, (ii)  no Event of Default exists, and (iii) there has been no Event of Default, whether cured, waived, or otherwise by Lender in the immediately preceding two (2) calendar months.

6.29 **Continuity of Operations**.  Borrower will not, directly or indirectly, engage in any business other than the form(s) of business in which it is engaged on the date of this Agreement, or discontinue any of its existing forms of business or substantially alter its method of doing business.

6.30 **Errors and Omissions**.  Borrower hereby covenants and agrees that it will within ten (10) days of a request by Lender, comply with any request by Lender to correct documentation errors, omissions or oversights, if any, that occur in any documentation relating to this Loan.

6.31 **Management Agreement**.   Borrower shall not enter into, amend, extend, substitute any management agreement covering all or any portion of the Project without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed. In the event that Lender grants such consent, Borrower shall cause the manager under said

agreement to enter into an agreement with Lender, reasonably acceptable in form and substance to Lender, pursuant to which said manager subordinates its liens for unpaid fees to the liens of the Mortgage and the other Loan Documents.

6.32   **Developer Fees**.  The Approved Budget contains a line item for a "**Development Fee**" in the amount of $1,172,142.10.  Subject to Lender's receipt and approval of satisfactory documentation relating to the development of the Project, the Development Fee shall be payable in monthly installments on the basis of the percentage of completion of the Project.  If an Event of Default occurs, no undisbursed development fees shall be paid.

(b)   No other fees in connection with the development of the Project shall be paid to Borrower, Manager, or any Affiliate of Borrower or any of the foregoing entities, without the prior written consent of Lender except as expressly permitted under Section 6.33 of this Agreement.

7.   **EVENTS OF DEFAULT AND REMEDIES**

7.1   **Events of Default**.

(a)   The occurrence of any one or more of the following will constitute an Event of Default under this Agreement:

(i)   Failure by Borrower or Guarantor to pay any monetary amount when due under any Loan Document and the expiration of seven (7) days after written notice of such failure by Lender to Borrower.

(ii)   Failure by Borrower or Guarantor to perform any obligation not involving the payment of money, or to comply with any other term or condition applicable to Borrower or Guarantor under any Loan Document and the expiration of thirty (30) days after written notice of such failure by Lender to Borrower.

(iii)   Any representation or warranty by Borrower or Guarantor in any Loan Document is materially false, incorrect, or misleading as of the date made.

(iv)   The occurrence of any Material Adverse Change.

(v)   Borrower or Guarantor (i) is unable or admits in writing Borrower's or Guarantor's inability to pay Borrower's or Guarantor's respective monetary obligations as they become due, (ii) fails to pay when due any monetary obligation, whether such obligation be direct or contingent, to any person in excess of One Hundred Thousand Dollars ($100,000), (iii) makes a general assignment for the benefit of creditors, or (iv) applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, or other custodian for Borrower or Guarantor or the property of Borrower or Guarantor or any part thereof, or in the absence of such application, consent, or acquiescence a trustee, receiver, or other custodian is appointed for Borrower or Guarantor or the

32

property of Borrower or Guarantor or any part thereof, and such appointment is not discharged within sixty (60) days.

(vi)     Commencement of any case under the Bankruptcy Code, Title 11 of the United States Code, or commencement of any other bankruptcy arrangement, reorganization, receivership, custodianship, or similar proceeding under any federal, state, or foreign law by or against Borrower or Guarantor and with respect to any such case or proceeding that is involuntary, such case or proceeding is not dismissed with prejudice within sixty (60) days of the filing thereof.

(vii)     Any litigation or proceeding is commenced before any Governmental Authority against or affecting Borrower or Guarantor or the property of Borrower or Guarantor or any part thereof and such litigation or proceeding is not defended diligently and in good faith by Borrower or Guarantor, as applicable.

(viii)     A final judgment or decree for monetary damages or a monetary fine or penalty (not subject to appeal or as to which the time for appeal has expired) is entered against Borrower or Guarantor by any Governmental Authority, which together with the aggregate amount of all other such judgments and decrees against Borrower or Guarantor that remain unpaid or that have not been discharged or stayed, exceeds Fifty Thousand Dollars ($50,000), is not paid and discharged or stayed within forty five (45) days after the entry thereof.

(ix)     Commencement of any action or proceeding which seeks as one of its remedies the dissolution of Borrower.

(x)     All or any part of the property of Borrower or Guarantor is attached, levied upon, or otherwise seized by legal process, and such attachment, levy, or seizure is not quashed, stayed, or released within twenty (20) days of the date thereof, or as soon as reasonably practicable if unable to be quashed, stayed, or released within twenty (20) days (but in no event to exceed sixty (60) days).

(xi)     The occurrence of any Transfer, unless prior to such Transfer the holder of the Note has delivered to Borrower the written consent of such holder to such Transfer.

(xii)     The occurrence of any default under any other Loan Document which continues beyond any applicable notice and cure period.

(xiii)     The occurrence of any default under any other credit facilities provided by Lender to Borrower which continues beyond any applicable notice and cure period.

(xiv)     If Borrower or its affiliates, at any time, ceases to manage the Project.

4817-3213-1027

(xv)    Inability of Borrower to satisfy any condition for the receipt of a disbursement hereunder, or to resolve the situation to the satisfaction of Lender, for a period in excess of thirty (30) days after written notice from Lender, unless (i) such inability has been caused by conditions beyond the control of Borrower, including without limitation, acts of God or the elements (specifically including but not limited to floods, snowfall, avalanches, or rockslides), fire, strikes, labor disputes, quarantine or other government shutdowns, pandemic, delays in delivery of material and disruption of shipping; (ii) Borrower has made adequate provision acceptable to Lender for the protection of materials stored on-site and for the protection of the Improvements to the extent then constructed against deterioration and against other loss or damage or theft; (iii) Borrower furnishes to Lender satisfactory evidence that such cessation of construction will not adversely affect or interfere with the rights of Borrower under material contract or subcontracts relating to the construction or operation of the Improvements; and (iv) Borrower furnishes to Lender satisfactory evidence that the completion of the Improvements can be accomplished by the Completion Date.

(xvi)    Commencement of any case under the Bankruptcy Code, Title 11 of the United States Code, or commencement of any other bankruptcy arrangement, reorganization, receivership, custodianship, or similar proceeding under any federal, state, or foreign law by or against General Contractor or the withdrawal of the General Contractor from proceeding with construction of the Project and the failure of Borrower to procure a contract at the same price, or, if at a higher price, to supply the additional funds thereby required with a new general contractor satisfactory to Lender within thirty (30) days from the occurrence of such bankruptcy, insolvency or withdrawal.

(xvii)   Failure to deposit with Lender in cash or cash equivalents the amount necessary to put the Loan "in balance" within ten (10) days of Lender's notice that the Loan is not "in balance".

(xviii)  Failure to deposit with or deliver to Lender any funds required to be deposited with or delivered to Lender under this Agreement, including, without limitation, any funds required under **Section 6.27** (Debt Service Coverage Ratio) hereof, within the time period set forth in the applicable sections.

7.2    **Remedies**.

(a)    Notwithstanding any provision to the contrary herein or any of the other Loan Documents, upon the happening of any Event of Default under this Agreement: (i) Lender's obligation to make further disbursements of the Loan will abate, and (ii) Lender may, at its option, have the right to declare all outstanding indebtedness to be immediately due and payable without presentment, demand, protest or notice of any kind, and the following additional remedies: Lender's obligation to make further disbursements to Borrower will terminate; Lender may, at its option, apply any of Borrower's funds in its possession to the outstanding indebtedness under the Note whether or not such indebtedness is then due; Lender may exercise any or all rights and remedies available to it under any or all of the Loan

34

Documents; and Lender will have the right to cause an independent contractor selected by Lender to enter into possession of the Premises and to perform any and all work and labor necessary for the completion of the Project substantially in accordance with the Plans and Specifications and to perform Borrower's obligations under this Agreement.  All sums expended by Lender for such purposes will be deemed to have been disbursed to and borrowed by Borrower and will be secured by the Deed of Trust on the Premises.

(b)     Borrower hereby constitutes and appoints Lender, or an independent contractor selected by Lender, as its true and lawful attorney-in-fact with full power of substitution for the purposes of completion of the Project and performance of Borrower's obligations under this Agreement in the name of the Borrower, and hereby empower said attorney-in-fact to do any or all of the following upon the occurrence of an Event of Default:

(i)     to use any of the funds of Borrower, including any balance of the Loan, as applicable, and any funds which may be held by Lender for Borrower, for the purpose of effecting completion of the Improvements in the manner called for by the Plans and Specifications;

(ii)     to make such additions, changes and corrections  in the Plans and Specifications as may be necessary to complete the Improvements in substantially the manner contemplated by the Plans and Specifications;

(iii)     to employ any contractors, subcontractors, agents, architects and inspectors required for said purposes;

(iv)     to employ attorneys to defend against attempts to interfere with the exercise of power granted hereby;

(v)     to pay, settle or compromise all existing bills and claims which are or may be liens against the   Premises, the Improvements or the Project or may be necessary or desirable for the completion of the Improvements or clearance of objections to or encumbrances on title;

(vi)     to execute all applications and certificates in the name of Borrower, which may be required by the General Contract, any Construction Contract, any Subcontract or any other construction contract;

(vii)     to prosecute and defend all actions or proceedings in connection with the Project and to take such action, require such performance and do any and every other act as is deemed necessary with respect to the completion of the Improvements which Borrower might do on its own behalf;

(viii)     to let new or additional contracts with the same contractors or others to the extent not prohibited by their existing contracts;

(ix)     to employ watchmen and erect security fences to protect the Project from injury; and

35

(x)    to take such action and require such performance as it deems necessary under any of the bonds or insurance policies to be furnished hereunder, to make settlements and compromises with the sureties or insurers thereunder, and in connection therewith to execute instruments of release and satisfaction.

It is understood and agreed that the foregoing power of attorney is deemed to be a power coupled with an interest which cannot be revoked until repayment of the Loan.

8.    **MISCELLANEOUS**

8.1    **Assignment**.  Borrower may not assign any of its rights under this Agreement except with the written consent of Lender.

8.2    **Notices**.  All notices, requests, demands and consents to be made hereunder to the parties hereto must be in writing and be delivered by hand or sent by registered mail or certified mail, postage prepaid, return receipt requested, through the United States Postal Service to the addresses shown below or such other address which the parties may provide to one another in accordance herewith.  Such notices, requests, demands and consents, if sent by mail will be deemed given two (2) Business Days after deposit in the United States mail, and if delivered by hand, will be deemed given when delivered.

To Lender:         ARGO MILL SL LLC
                   2808 Fairmont Street
                   Suite 130
                   Dallas, Texas 75201

                   With a  copy (which shall not constitute notice) to:

                   Snell and Wilmer L.L.P.
                   1200 Seventeenth Street, Suite 1900
                   Denver, Colorado 80202
                   Attention: David Clark, Esq.

To Borrower:       Mighty Argo Cable Car, LLC
                   1431 Miner Street
                   PO BOX 1201
                   Idaho Springs, Colorado 80452

To Guarantor:      Mary Jane Loevlie

                   1431 Miner Street
                   PO BOX 1201
                   Idaho Springs, Colorado 80452

                   With a copy (which shall not constitute notice) to:

                   Welborn Sullivan Meck & Tooley, P.C.
                   1125 17th Street, Suite 2200

36

Denver, Colorado 80202
Attention: Mike Fredregill

8.3     **Authority to File Notices**.  Borrower irrevocably appoints Lender as its attorney-in-fact, with full power of substitution, to file for record, at the Borrower's cost and expense and in Borrower's name, any notices of completion, notices of cessation of labor, or any other notices that Lender considers necessary or desirable to protect its security.

8.4     **Inconsistencies with the Loan Documents**.  In the event of any inconsistencies between the terms of this Agreement and any terms of any of the Loan Documents, the terms of this Agreement will govern and prevail.

8.5     **No Waiver**.  No disbursement of proceeds of the Loan will constitute a waiver of any conditions to Lender's obligation to make further disbursements nor, in the event Borrower is unable to satisfy any such conditions, will any such waiver have the effect of precluding Lender from thereafter declaring such inability to constitute a default or Event of Default under this Agreement.

8.6     **Lender Approval of Instruments and Parties**.  All proceedings taken in accordance with transactions provided for herein; all surveys, appraisals and documents required or contemplated by this Agreement and the persons responsible for the execution and preparation thereof; must be satisfactory to and subject to approval by Lender.  Lender's counsel will be provided with copies of all documents which they may reasonably request in connection with the Agreement.

8.7     **Lender Determination of Facts**.  Lender is at all times free to establish independently, to its satisfaction, the existence or nonexistence of any fact or facts, the existence or nonexistence of which is a condition of this Agreement.

8.8     **Incorporation of Preamble, Recitals and Exhibits**.  The preamble, recitals and exhibits hereto are hereby incorporated in to this Agreement.

8.9     **Third-Party Consultants**.  Lender may hire such third-party consultants as it deems reasonably necessary, the costs of which will be paid by Borrower, to provide the following services: (a) review final Plans and Specifications and final construction cost breakdown and the Construction Schedule; (b) conduct compliance inspections with respect to the progress of construction of the Project and approve each element of a request for disbursement relating to construction costs; and (c) perform such other services as may, from time to time, be required by Lender.  This obligation on the part of Borrower will survive the closing of the Loan until paid.  Borrower hereby authorizes Lender, in its discretion, to pay such expenses, charges, costs and fees at any time by a disbursement of the Loan.

8.10    **Payment of Expenses**.  Borrower must pay all taxes and assessments and all expenses, charges, costs and fees provided for in this Agreement and the Budget or relating to the Loan or construction of the Improvements, including, without limitation, any fees incurred for recording or filing any of the Loan Documents, title insurance premiums and charges, tax service contract fees, fees of any consultants, fees and expenses of Lender's counsel, documentation and processing fees, printing, photostating and duplicating expenses, air freight

37

charges, escrow fees, costs of surveys, premiums of hazard insurance policies and surety bonds and fees for any appraisal and appraisal review, market or feasibility study required by Lender. Borrower hereby authorizes Lender to disburse the proceeds of the Loan to pay such expenses, charges, costs and fees when due notwithstanding that Borrower may not have requested a disbursement of such amount.  Lender may make such disbursements notwithstanding the fact that the Loan is not "in balance" or that Borrower is in default under the terms of this Agreement or any other Loan Document.  Such disbursement will be added to the outstanding principal balance of the Note.  The authorization hereby granted is irrevocable, and no further direction or authorization from Borrower is necessary for Lender to make such disbursements.  However, the provision of this **Section 8.10** do not prevent Borrower from paying such expense, charges, costs and fees from its own funds.  All such expenses, charges, costs and fees are Borrower's obligation regardless of whether or not Borrower has requested and met the conditions for a disbursement of the Loan.  The obligations on the part of Borrower under this **Section 8.10** will survive the closing of the Loan and the repayment thereof.  Borrower hereby authorizes Lender, in its discretion, to pay such expenses, charges, costs and fees at any time by a disbursement of the Loan as provided for in the Loan Documents.

8.11   **Disclaimer by Lender**.   Lender will not be liable to any contractor, subcontractor, supplier, laborer, architect, engineer or any other party for services performed or materials supplied in connection with the Project.  Lender will not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Premises or the Project.  Borrower is not and will not be an agent of Lender for any purpose.  Lender is not a joint venture partner with Borrower or with the constituent partners in Borrower in any manner whatsoever.  Prior to default by Borrower under this Agreement and the exercise of remedies granted herein, Lender will not be deemed to be in privity of contract with any contractor or provider of services to the Project, nor will any payment of funds directly to a contractor, subcontractor, or provider of services be deemed to create any third party beneficiary status or recognition of same by Lender.  Approvals granted by Lender for any matters covered under this Agreement will be narrowly construed to cover only the parties and facts identified in any written approval or, if not in writing, such approvals will be solely for the benefit of Borrower.

8.12   **Indemnification**.  To the fullest extent permitted by law, Borrower agrees to protect, indemnify, defend and save harmless Lender, its directors, officers, agents and employees for, from and against any and all liability, expense or damage of any kind or nature and for, from and against any suits, claims or demands, including reasonable legal fees and expenses on account of any matter or thing or action or failure to act by Lender, whether in suit or not, arising out of this Agreement or in connection herewith, including, without limitation, any suit, claim or demand arising out of any default which may occur under the CC&Rs.  Upon receiving knowledge of any suit, claim or demand asserted by a third party that Lender believes is covered by this indemnity, Lender will give Borrower notice of the matter and an opportunity to defend it, at Borrower's sole cost and expense, with legal counsel satisfactory to Lender. Lender may also require Borrower to so defend the matter.  The obligations on the part of Borrower under this **Section 8.12** will survive the closing of the Loan and the repayment thereof.

8.13   **Titles and Headings**.  The headings at the beginning of each section of this Agreement are solely for convenience and are not part of this Agreement.  Unless otherwise

indicated, each reference in this Agreement to a section or an exhibit is a reference to the respective section herein or exhibit hereto.

8.14 **Brokers**. Except for any amounts owed to Teneo Securities LLC, Borrower and Lender represent to each other that neither of them knows of any brokerage commissions or finders' fee due or claimed with respect to the transaction contemplated hereby. Borrower and Lender will indemnify and hold harmless the other party for, from and against any and all loss, damage, liability, or expense, including costs and reasonable attorney fees, which such other party may incur or sustain by reason of or in connection with any misrepresentation by the indemnifying party with respect to the foregoing.

8.15 **Change, Discharge, Termination. or Waiver**. No provision of this Agreement may be changed, discharged, terminated, or waived except in writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought. No failure on the part of Lender to exercise and no delay by Lender in exercising any right or remedy under the Loan Documents or under the law will operate as a waiver thereof.

8.16 **CHOICE OF LAW**. THIS AGREEMENT HAS BEEN DELIVERED IN COLORADO, AND WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF COLORADO. THE COURTS OF COLORADO, FEDERAL OR STATE, WILL HAVE JURISDICTION OF ALL LEGAL ACTIONS ARISING OUT OF THIS AGREEMENT. BY EXECUTING THIS AGREEMENT, THE UNDERSIGNED SUBMITS TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS OF COLORADO.

8.17 **Disbursements in Excess of Loan Amount**. In the event the total disbursements by Lender exceed the amount of the Loan, to the extent permitted by the laws of the State of Colorado, the total of all disbursements will be secured by the Deed of Trust. All other sums expended by Lender pursuant to this Agreement or any other Loan Documents will be deemed to have been paid to Borrower and will be secured by, among other things, the Deed of Trust.

8.18 **Signs**. Throughout the term of the Loan, Lender will have the right to erect one or more signs on the Project indicating its provision of financing for the Project, with a size and in a location as mutually determined by Borrower and Lender, and Lender will also have the right to publicize its financing of the Project as Lender and Borrower may deem appropriate.

8.19 **JURY WAIVER**. BORROWER AND LENDER HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR ANY OTHER RELATED DOCUMENT OR LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN OR IN THE OTHER LOAN DOCUMENTS.

8.20 **Patriot Act Provisions**. The following notification is provided to Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

(a) IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.  What this means for Borrower:  When Borrower opens an account, if Borrower is an individual, Lender will ask for Borrower's name, taxpayer identification number, residential address, date of birth, and other information that will allow Lender to identify Borrower and, if Borrower is not an individual, Lender will ask for Borrower's name, taxpayer identification number, business address, and other information that will allow Lender to identify Borrower.  Lender may also ask, if Borrower is an individual, to see Borrower's driver's license or other identifying documents and, if Borrower is not an individual, to see Borrower's legal organizational documents or other identifying documents.

(b) Government Regulation.  Borrower must not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with Borrower, or (b) fail to provide documentary and other evidence of Borrower's identity as may be requested by Lender at any time to enable Lender to verify Borrower's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

8.21   **Participations**.  Lender will have the right at any time to sell, assign, transfer, negotiate or grant participations in all or any part of the Loan or the Note to one or more assignees or participants.  Borrower hereby acknowledges and agrees that any such disposition will give rise to a direct obligation of Borrower to each such assignee and participant.  Lender may disseminate any information it now has or hereafter obtains pertaining to the Loan, including any security for the Loan and credit or other information on the Project, Borrower, any of Borrower's principals and any guarantor, to any actual or prospective assignee or participant, to Lender's affiliates, to any regulatory body having jurisdiction over Lender and to any other parties as necessary or appropriate in Lender's reasonable judgment.

8.22   **Pledge by Lender**.  Lender may at any time pledge a security interest in all or any portion of its rights under this Agreement to secure obligations of Lender, including without limitation any pledge to secure obligations to a Federal Reserve Bank; provided that no such pledge of a security interest will release Lender from any of its obligations hereunder or substitute any such pledgee for Lender as a party hereto.

8.23   **Counterparts**.  This Agreement may be executed in any number of counterparts each of which will be deemed an original, but all such counterparts together will constitute but one agreement.

8.24   **Time is of the Essence**.  Time is of the essence of this Agreement.

8.25   **Attorneys' Fees**.  Borrower agrees to pay all costs of enforcement and collection and preparation for any Event of Default or any action taken by Lender (including, without

limitation, reasonable attorneys' fees) whether or not any action or proceeding is brought (including, without limitation, all such costs incurred in connection with any bankruptcy, receivership, or other court proceedings [whether at the trial or appellate level]), together with interest thereon from the date of demand at the Default Interest Rate.

8.26   **Integration**.   The Loan Documents contain the complete understanding and agreement of Borrower and Lender and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.

8.27   **Binding Effect**.   The Loan Documents will be binding upon, and inure to the benefit of, Borrower and Lender and their respective successors and assigns.  Borrower may not delegate its obligations under the Loan Documents.

8.28   **Survival**.   The representations, warranties, and covenants of the Borrower and the Loan Documents will survive the execution and delivery of the Loan Documents and the making of the Loan.

8.29   **Number and Gender**.   In this Agreement the singular will include the plural and the masculine will include the feminine and neuter gender and vice versa, if the context so requires.

8.30   **Right of First Refusal**.   Lender shall have the right of first offer to have Lender or an Affiliate thereof provide  any follow on, construction financing for future phases, or re-financing of the Premises (the "**Re-Finance**") if at any time during the term of the Loan Borrower elects to seek such financing.  In such event, Borrower shall provide Lender a standard financing package including standard financial information and such other information reasonably requested by Lender to fully underwrite the Re-Finance.  Within 30 days after Borrower has submitted a standard finance package to Lender, Lender will provide an application with a Re-Finance offer.  If the terms offered by Lender are not substantially the same as those offered by the third-party lender (e.g. term, interest rate, loan to value) then Borrower has the right to enter into a such Re-Finance loan with third-party lender.

9.   **EXHIBITS**

The following exhibits to this Agreement are fully incorporated herein as if set forth at length:

Exhibit A - Premises Description
Exhibit B - Budget and Disbursement Schedule
Exhibit C - Closing Requirements
Exhibit D - Request for Loan Advance
Exhibit E - Survey Certification
Exhibit F – Extension Certificate

[Signature Page Follows]

41

IN WITNESS WHEREOF, Lender and Borrower have caused this Agreement to be duly executed and delivered as of the date first above written.

**MIGHTY ARGO CABLE CAR, LLC,** a Colorado limited liability company

By: ARGO GP, LLC, a Colorado limited liability company, Manager

By: _____
       Mary Jane Loevlie
       Manager

"BORROWER"

Signature Page to Construction Loan Agreement

ARGO MILL SL LLC, a Delaware limited
liability company

By: TriVecta Capital Group Inc., a Delaware
    corporation, Sole Member

By: _____
    Jay Matthiesen
    Chief Executive Officer

                                    "LENDER"

Signature Page to Construction Loan Agreement

4817-3213-1027

**<u>EXHIBIT A</u>**

**Legal Description of Premises**

Lots 1, 2 and 3 of Mighty Argo Mill Minor Subdivision, recorded December 30, 2020 at Reception No. 298805 City of Idaho Springs, County of Clear Creek, State of Colorado.

Exhibit A Page 1

# EXHIBIT B

## Budget

| | Costs | Current Budget | Proposed Changes for Current Draw | Proposed Budget for Current Draw | Previous Drawn | Current Draw Request | Drawn to Date | Budget Balance | Retainage Withheld to Date (Not Drawn) | % |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Mighty Argo Cable Car, LLC | | | | | | |
| | | | | Phase I Development | | | | | | |
| | | | | Construction Budget and Draw Tracking | | | | | | |
| | | | | Draw #1 | | | | | | |
| | | | | Costs through 10/31/20 | | | | | | |
| 1 | **SOURCES** | | | | | | | | | |
| 2 | Construction Loan | 32,812,000.00 | 1,087,676.78 | 33,900,000.00 | - | 2,006,227.89 | 2,006,227.89 | 31,893,772.11 | - | 6% |
| 3 | Shareholders Equity | 1,500,000.00 | - | 1,500,000.00 | 1,500,000.00 | - | 1,500,000.00 | - | - | 100% |
| 3a | Loans/Promissory Notes | - | - | - | 1,460,456.03 | - | 1,460,456.03 | (1,460,456.03) | | |
| 4 | Shareholders Equity in Escrow | 4,500,000.00 | - | 4,500,000.00 | - | 4,500,000.00 | 4,500,000.00 | - | - | 100% |
| 5 | District Bond Proceeds | 1,428,800.21 | - | 1,428,800.21 | - | - | - | 1,428,800.21 | - | 0% |
| 6 | | | | | | | | | | |
| 7 | **Total Sources** | 40,240,800.21 | 1,087,676.78 | 41,328,800.21 | 2,960,456.03 | 6,506,227.89 | 9,466,683.92 | 31,862,116.29 | - | 23% |
| 8 | **USES** | | | | | | | | | |
| 9 | **LAND AND HARD COSTS:** | | | | | | | | | |
| 10 | Land and Artifact Acquisition | 800,000.00 | - | 800,000.00 | - | 800,000.00 | 800,000.00 | - | - | 100% |
| 11 | Cable Car | 8,321,017.00 | - | 8,321,017.00 | 1,350,000.00 | 1,532,201.00 | 2,882,201.00 | 5,438,816.00 | - | 35% |
| 12 | Utilities | 491,226.76 | - | 491,226.76 | - | 447,426.76 | 447,426.76 | 43,800.00 | - | 91% |
| 13 | Utility Relocation | 410,825.25 | - | 410,825.25 | - | 410,825.25 | 410,825.25 | - | - | 100% |
| 14 | Argo Landing | | | | | | | | | |
| 30 | *Total Argo Landing* | 12,075,774.03 | 500,000.00 | 12,575,774.03 | - | 404,842.74 | 404,842.74 | 12,170,931.29 | 17,440.41 | 3% |
| 31 | Argo Station | | | | | | | | | |
| 36 | *Total Argo Station* | 2,260,232.00 | - | 2,260,232.00 | - | 28,876.00 | 28,876.00 | 2,231,357.00 | - | 1% |
| 37 | Parking Garage | | | | | | | | | |
| 41 | *Total Parking Garage* | 4,746,818.80 | - | 4,746,818.80 | - | 28,876.00 | 28,876.00 | 4,717,943.80 | - | 1% |
| 42 | Caretaker Cottage | | | | | | | | | |
| 44 | *Total Caretaker Cottage* | 125,000.00 | - | 125,000.00 | - | - | - | 125,000.00 | - | 0% |
| 45 | VCMP Trail System | | | | | | | | | |
| 47 | *Total VCMP Trail System* | 400,000.00 | - | 400,000.00 | - | - | - | 400,000.00 | - | 0% |
| 48 | Moment Factory Show | | | | | | | | | |
| 52 | *Total Moment Factory Show* | 472,658.78 | - | 472,658.78 | 24,123.25 | 248,535.51 | 272,658.76 | 200,000.00 | | 58% |
| 53 | **Total Hard Costs** | 30,103,552.60 | 500,000.00 | 30,603,552.60 | 1,374,123.25 | 3,901,581.26 | 5,275,704.51 | 25,327,848.09 | 17,440.41 | 17% |
| 54 | | | | | | | | | | |
| 55 | **SOFT COSTS:** | | | | | | | | | |
| 56 | Predevelopment Costs | 541,084.27 | - | 541,084.27 | 541,084.27 | - | 541,084.27 | - | - | 100% |
| 57 | Architectural and Engineering | 2,098,930.40 | - | 2,098,930.40 | 656,126.42 | 599,729.21 | 1,255,855.63 | 842,734.77 | - | 60% |
| 58 | Legal Fees - General | 200,000.00 | - | 200,000.00 | 45,831.43 | 6,993.75 | 52,825.18 | 147,174.82 | - | 26% |
| 59 | Legal Fees - District | 120,000.00 | - | 120,000.00 | 5,583.69 | 86,606.76 | 92,190.45 | 27,809.55 | - | 77% |
| 60 | Legal Fees - Loan | 60,000.00 | - | 60,000.00 | 3,445.00 | 1,793.75 | 5,238.75 | 54,761.25 | - | 9% |
| 61 | Legal Fees - Miscellaneous | 100,000.00 | - | 100,000.00 | 54,858.75 | 20,061.80 | 74,920.55 | 25,079.45 | - | 75% |
| 62 | Insurance | 225,000.00 | - | 225,000.00 | - | - | - | 225,000.00 | - | 0% |
| 63 | Marketing | 100,000.00 | - | 100,000.00 | 7,278.13 | 231.25 | 7,509.38 | 92,490.62 | - | 8% |
| 64 | Geotechnical Report | 100,000.00 | - | 100,000.00 | 87,497.63 | 9,570.00 | 97,067.63 | 2,932.37 | - | 97% |
| 65 | Environmental | 60,000.00 | - | 60,000.00 | 6,130.50 | 9,606.41 | 15,745.91 | 44,254.09 | - | 26% |
| 66 | Materials Testing | 266,965.00 | - | 266,965.00 | - | - | - | 266,965.00 | - | 0% |
| 67 | Developer Fee @ 4% of Hard Costs | 1,172,142.10 | - | 1,172,142.10 | 79,468.21 | 266,649.60 | 346,117.81 | 826,024.29 | - | 30% |
| 68 | Consultants/Management | 358,931.09 | 50,000.00 | 408,931.09 | 39,000.00 | 102,681.09 | 141,681.09 | 267,250.00 | - | 35% |
| 69 | Permits and Fees | 375,000.00 | - | 375,000.00 | 56,741.69 | 245,483.01 | 302,224.70 | 72,775.30 | - | 81% |
| 70 | Third Party Reports | 30,000.00 | - | 30,000.00 | - | - | - | 30,000.00 | - | 0% |
| 71 | Property Taxes | 50,000.00 | - | 50,000.00 | - | - | - | 50,000.00 | - | 0% |
| 72 | Misc. Soft Costs | 100,000.00 | - | 100,000.00 | 3,277.86 | - | 3,277.86 | 96,722.14 | - | 3% |
| 73 | Loan Fee | 656,561.22 | 21,458.78 | 678,000.00 | - | 656,240.00 | 656,240.00 | 21,760.00 | - | 97% |
| 74 | Lender Oversight Fee | 60,000.00 | - | 60,000.00 | - | - | - | 60,000.00 | - | 0% |
| 75 | Lender Expense Deposit | 30,000.00 | 5,000.00 | 35,000.00 | - | 35,000.00 | 35,000.00 | - | - | 100% |
| 76 | Broker Fee | 370,000.00 | 80,000.00 | 450,000.00 | - | 450,000.00 | 450,000.00 | - | - | 100% |
| 77 | Closing Costs | 114,000.00 | 15,740.00 | 129,740.00 | - | 114,000.00 | 114,000.00 | 15,740.00 | - | 88% |
| 78 | Contingency | 1,950,000.00 | (135,000.00) | 1,815,000.00 | - | - | - | 1,815,000.00 | - | 0% |
| 79 | Contingency - Cable Car | 106,797.00 | - | 106,797.00 | - | - | - | 106,797.00 | - | 0% |
| 80 | **Total Soft Costs** | 9,243,071.08 | 37,176.78 | 9,282,249.86 | 1,586,332.78 | 2,604,646.63 | 4,190,979.41 | 5,091,270.45 | - | 45% |
| 81 | | | | | | | | | | |
| 82 | **INTEREST RESERVE** | 892,497.75 | 550,000.00 | 1,442,997.75 | - | - | - | 1,442,997.75 | - | 0% |
| 83 | | | | | | | | | | |
| 84 | **Total Uses** | 40,241,121.43 | 1,087,676.78 | 41,328,800.21 | 2,960,456.03 | 6,506,227.89 | 9,466,683.92 | 31,862,116.29 | 17,440.41 | 23% |

Exhibit B Page 1

## EXHIBIT C

### Closing Requirements

The obligations of Lender to make the Loan to Borrower and to perform the remainder of its obligations under the Agreement are expressly conditioned upon its receipt and approval of each of the following items:

(a) **Appraisal**.  The Appraisal.

(b) **Construction Contracts**.  One copy of the General Contract and any other Construction Contracts, and such financial statements of the General Contractor and each Construction Contractor as Lender may require.  The copy of the General Contract or any Construction Contract delivered to Lender must include, at Lender's request, a schedule showing all Subcontracts awarded as of the date of delivery of such General Contract or Construction Contract to Lender, including names, types of work, Subcontract amounts and the percentage retainage provided in said Subcontracts.  Overhead and profit payable under the General Contract and any Construction Contract must be payable in accordance with the percentage of completion of the contracted scope of work.  The General Contract and each Construction Contract must contain the Retainage requirements set forth in this Agreement.

(c) **Agreements**.  One copy, if any, of Borrower's agreements with all other parties providing architectural, design or engineering services for the Project.

(d) **Budget**.  The Budget.

(e) **Plans and Specifications**.  Two complete sets of the Plans and Specifications.

(f) **Construction Schedule**.  The Construction Schedule.

(g) **Construction Cost Review**.  A satisfactory review by Lender, in its sole and absolute discretion, of a construction cost analysis performed by an outside consultant, at Borrower's cost.

(h) **Subcontracts**.

(i) At Lender's request, a copy of the standard form of Subcontract to be used by the General Contractor, which form must not prohibit an assignment of the Subcontract to Lender or require Subcontractor's consent thereto.  All Subcontracts for the Project must be written on the form of Subcontract, if applicable, approved by Lender.

(ii) At Lender's request, copies of all Subcontracts executed prior to the Closing Date.

Exhibit C Page 1

4817-3213-1027

(iii)    At Lender's request, the form and copies of all construction bonds obtained by the General Contractor covering any Subcontractor that has executed a Subcontract prior to the Closing Date.

(i)    **Payment and Performance Bond**.  A copy of the payment and performance bond provided by General Contractor, in form and substance satisfactory to Lender, duly recorded in the Official Records of the County.

(j)    **Authorizations**.  All authorizations, including building permits, annexation agreements, plot plan approvals, subdivision approvals, environmental approvals (including an environmental impact report or negative declarations if required under applicable law), sewer and water permits and zoning and land use entitlements which are necessary for the construction of the Project in accordance with the proposed Plans and Specifications and in accordance with all applicable building, environmental, subdivision, land use and zoning laws and for tax assessment purposes.

(k)    **Title Report**.  The Preliminary Title Report and evidence satisfactory to Lender that the Title Company is prepared to issue the Title Insurance Policy.

(l)    **Survey**.  The Survey.

(m)    **Insurance**.  Certificates of insurance showing Lender as certificate holder and lender loss payable and/or additional insured, as applicable, and copies of the policies of insurance required under **Section 6.19** of the Loan Agreement.

(n)    **Assignment of Plans**.  Assignment of the Plans and Specifications, together with the architect's agreement and consent of architect.

(o)    **Assignment of General Contract**.  Assignment of General Contract together with related consent and estoppel certificate, each in form and substance as reasonably required by Lender.

(p)    **Formation Documents**.  Complete copies of all formation documents relating to Borrower and any partners or members in Borrower, as applicable, together with such certificates and resolutions as may be required by Lender.  .

(q)    **Flood Zone**.  Evidence satisfactory to Lender, as to whether (a) the Premises are located in an area designated by the U.S. Department of Housing and Urban Development as having special flood or mudslide hazards, and (b) the community in which the Premises are located is participating in the National Flood Insurance Program.

(r)    **Soils Tests**.  A soils test report prepared by a licensed soils engineer satisfactory to Lender showing the locations of, and containing boring logs for, all borings, together with recommendations for the design of the foundations, paved areas and underground utilities for the Project.

(s)    **Utilities**.  Evidence satisfactory to Lender, which may be in the form of letters from local utility companies or local authorities, that (a) telephone service, electric power, storm

Exhibit C Page 2

sewer, sanitary sewer and water facilities are available to the Premises; (b) such utilities are adequate to serve the Project and exist at the boundary of the Project; and (c) no conditions exist to affect Borrower's right to connect into and have unlimited use of such utilities except for the payment of a normal connection charge and except for the payment of subsequent charges for such services to the utility supplier.

(t)      **Environmental Assessment**.   An environmental assessment report for the Premises, performed by an environmental engineer that is acceptable to Lender, and which assessment is in form and substance satisfactory to Lender in Lender's sole discretion.

(u)      **Environmental Questionnaire**.  Lender's form of environmental questionnaire completed by Borrower, in form and substance satisfactory to Lender in Lender's sole discretion.

(v)      **Financial Statements**.   Financial statements including, without limitation, an opening balance sheet of Borrower and a balance sheet, cash flow statement and profit and loss statement of Borrower, for Borrower's three (3) most recent fiscal years (to the extent available), certified by Borrower.  Financial statements of Guarantor including, without limitation, a balance sheet, cash flow statement and profit and loss statement of Guarantor, for Guarantor's three (3) most recent fiscal years (to the extent available), certified by Guarantor. Notwithstanding the foregoing, Lender acknowledges and agrees it has reviewed such financial statements as of the effective date hereof.

(w)      **Non-Foreign Certificate**.  The Certification of Non-Foreign Status.

(x)      **Taxes**.  Satisfactory evidence to Lender that all real property taxes, assessments, water, sewer or other charges levied or assessed against the Project have been paid in full.

(y)      **Site Plan**.  Site plan and grading plan.

(z)      **Equity**.  Satisfactory evidence to Lender that Borrower has paid from its own funds, the difference between the Project Costs and the Loan Amount, which equity amount must not be less than $4,500,000.00. Borrower's equity must be comprised of a combination of cash to be deposited with Lender together with prepaid costs of construction within the categories listed in the Budget, which categories may include land costs, professional fees, permit fees and construction loan fees.

(aa)      **Evidence of Zoning**.  Evidence satisfactory to Lender that the Project will comply with applicable zoning ordinances.

(bb)      **Lease Form**.  The Standard Lease Form.

(cc)      **Management Agreement**.  Borrower has provided Lender with a fully executed and complete copy of the Management Agreement, if any, in effect for the Project.

(dd)      **Opinion Letter**.  An opinion letter in form and substance satisfactory to Lender,.

(ee)      **No Broken Priority**.  Evidence satisfactory to Lender that no materials have been delivered to or work commenced on the Premises on or prior to the Closing Date.

Exhibit C Page 3

4817-3213-1027

(ff)     **<u>Other Items</u>**.  Such other items or documents as Lender may reasonably require.

Exhibit C Page 4

4817-3213-1027

**<u>EXHIBIT D</u>**

**Form of Request for Loan Advance**

REQUEST FOR LOAN ADVANCE – COMMERCIAL

Attn: Real Estate Loan Dept.
2808 Fairmont Street
Suite 130
Dallas, Texas 75201

**RE:     Application for Advance in connection with a Loan in the amount of $[_____]
to Mighty Argo Cable Car, LLC ("<u>Borrower</u>")**

Pursuant to that certain Loan Agreement dated January 20, 2021 ("**<u>Loan Agreement</u>**") between Borrower and Argo Mill SL LLC, a Delaware limited liability company ("**<u>Lender</u>**"), Borrower hereby requests an Advance in the amount of $_____. We acknowledge that this amount is subject to inspection, verification, and available funds.  All capitalized terms used but not defined in this Request for Loan Advance shall have the meanings assigned to such terms in the Loan Agreement

1.       Borrower acknowledges that the approval of this Advance by Lender is subject to all of the terms and conditions precedent for the disbursement of Loan proceeds, including, without limitation, inspection of the Land and Improvements, verification of the matters set forth in this Request for Loan Advance and the availability of Loan proceeds.

2.       Borrower has provided the draw package in accordance with the construction loan draw process described in **<u>Article 4</u>** of the Loan Agreement.

3.       Borrower agrees to provide, if requested by Lender, a Vendor Payee List (Sworn Owner's Statement), showing the name and the amount currently due each party to whom Borrower is obligated for labor, material and/or services supplied.  This information would be provided in support of the disbursements requested in this Request for Loan Advance.

4.       Borrower to its actual knowledge hereby represents, warrants and covenants with Lender as follows:

b)       All conditions precedent to the Advance have been satisfied, including, without limitation, performance of all of the then-pending obligations of Borrower under the Loan Agreement and the other Loan Documents;

c)       All representations and warranties made by Borrower to Lender in the Loan Agreement and otherwise in connection with the Loan continue to be accurate;

d)       All permits and licenses required in connection with the work performed to date were duly issued prior to commencement of such work.

Exhibit D Page 1

e)      No Event of Default has occurred under the Loan Agreement or under any Loan Document, and no event, circumstance or condition has occurred or exists which, with the passage of time or the giving of notice, would constitute a Event of Default under the Loan Agreement or under the other Loan Documents;

f)      Borrower has received no notice and has no knowledge of any litigation, proceedings (including proceedings under Title 11 of the United States Code), liens or claims of lien, either filed or threatened against Borrower, any Guarantor, the Improvements, the Contractor, or the Premises, except the liens of the Bank and those which are specifically identified in writing to Lender;

g)      No event, circumstance or condition exists or has occurred which could delay or prevent the completion of the Improvements by the completion date of [_____], 202[__];

h)      All Advances advanced by Lender to Borrower for labor, materials and/or services furnished prior to this draw request have been paid to the parties entitled to such payment, and all Loan Proceeds so disbursed have been used for the purposes set forth in the Loan Agreement;

i)      All amounts owed to Contractor, any other contractor, and all subcontractors for all work done to date (other than amounts included in this Request for Advance and other than Retainage) have been paid;

j)      All work and materials furnished to date for the Improvements conform with the Plans and Specifications, and Borrower has approved all work and materials for which a payment is now due and for which this Advance is being requested;

k)      The total amount of the requested Advance represents the actual amount payable to the Contractor and/or subcontractors who have performed work on the Improvements, and all of the Advance requested hereby will be used as payment for the work on the Improvements described on the attached documentation and for no other reason;

l)      All change orders or changes to the Plans and Specifications or the Schedule of Values have been delivered to Lender and, to the extent Lender's approval is required for such change orders or changes under the Loan Agreement, have been approved by Lender; and

m)      There is no In-Balance Deficit, taking into account any change orders approved by Lender.

5.      Disbursement of the Loan Proceeds requested hereby may be subject to (a) the receipt by Lender of a certificate from the issuing Title Company stating that no claims have been filed of record which adversely affect the title, and (b) approval from Lender's Consultant.

6.      The amount of change orders in dispute between Borrower and the Contractor (or any subcontractor) is $_____.

7.      Borrower hereby agrees and acknowledges that this affidavit is made for the purpose of inducing Lender to make an Advance to Borrower, and Borrower certifies that the statements made herein and in any documents submitted herewith are true and correct.

8.      Borrower requests that this draw be funded and that the funds be disbursed into Account No. _____ at _____.

Executed this _____ day of _____, _____.

<div style="margin-left:40%">

**BORROWER:**

**MIGHTY ARGO CABLE CAR, LLC**, a Colorado limited liability company

By:  ARGO GP, LLC, a Colorado limited liability
    company, Manager

By:_____
     Mary Jane Loevlie
     Manager

</div>

4817-3213-1027

# **EXHIBIT E**

### **Survey Certification**

To:     TriVecta Capital Group, LLC, a Texas limited liability company, and its successors and/or assigns, Mighty Argo Cable Car, LLC, a Colorado limited liability company and *[Title Insurance Company]*

This is to certify that this map or plat and the survey on which it is based were made in accordance with the "2016 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys" jointly established and adopted by ALTA and NSPS, and includes items 1, 2, 3, 4, 6(a), 6(b), 7(a), 7(b)(1), 8, 9, 13, 16, 17, 19 and 20 of Table A thereof, and in addition as Table A Item 21 the following: 21(a) the locations of existing improvements as measured on each side to the nearest property line; 21(b) interior lot lines, if any; and 21(c) all water retention areas and drainage water receptacles.  The fieldwork was completed on _____.

For purposes of identifying easements, reservations and private restrictions of record, I have reviewed and relied on *[Title Insurance Company's]* Commitment No. _____ dated _____.

_____

_____, P.L.S. No. _____

4817-3213-1027

# EXHIBIT E

**EXHIBIT A**

**SUMMARY OF TERMS AND CONDITIONS FOR SENIOR CONSTRUCTION LOAN**

August __9__ , 2020

| | |
|---|---|
| **Project:** | Mighty Argo Cable Car, LLC is prepared to install a new detachable gondola system from the existing historic Argo Tunnel & Mill site in Idaho Springs, CO. In addition to the gondola system, an Upper Landing will be built accommodating food/beverage, retail and outdoor observatories, and a hike and bike trail system is being designed and implemented from the proposed Upper Landing back down the Argo Tunnel entrance, thus enhancing the site traffic significantly (TCG/Lender acknowledge that the hike and bike trail system and related real property is owned and operated by the City of Idaho Springs and shall not be included as collateral or otherwise encumbered in any way). A Lower Landing and parking deck will be built to accommodate visitors. |
| **Loan Purpose:** | Loan will be used to finance the marketing, construction, completion and stabilization of the Project. |
| **Property:** | 2350 Riverside Dr., Idaho Springs, Colorado, exact land area for collateral purposes to be determined via a borrower provided ALTA survey prior to closing. |
| **Borrower:** | A single asset bankruptcy remote entity(s) with independent director(s) (the "**Borrower**") acceptable to Lender. |
| **Lender:** | TriVecta Capital Group LLC ("**TCG**") or an affiliate or nominee designated by TCG (the "**Lender**"), which shall provide a Construction loan for the development. |
| **Loan Facility:** | A **Senior Loan Facility** ("**Facility**") of the lesser of (i) Thirty Two Million ($32,372,000) USD and/or (ii) Eighty Four Percent (84%) of the final Lender Approved Development Budget for the Property ("**Maximum Senior Loan Amount**"). Any amounts allocated to the Reserves defined below shall be deemed fully disbursed at the time of funding. |
| **Cash Equity by Borrower:** | Borrower shall contribute **Cash Equity** equal to Four Million Five Hundred Thousand US Dollars ($4,500,000), which shall be contributed to Lender's escrow immediately at execution of this term sheet to be held till closing and issuance with the Loan draw(s). Lender and Borrower will execute an escrow agreement.In the event that the Loan Facility fails to close within 90 days from execution of the term sheet such $4,500,000 escrow contribution shall be fully refunded to Borrower within 15 days following written request from Borrower. Provided Borrower contributes the Cash Equity, in the event the closing fails to occur as set forth herein, the Cash Equity shall be immediately returned to Borrower and there shall be no additional fees or penalties due from Borrower excepting the Expense Deposit shall be due, in full, immediately. |
| **Funding:** | All required cash equity must be contributed to the Project before any loan proceeds are funded. All Cash Equity proceeds, if any, will be held in Escrow Account for distribution by Lender on behalf of the Borrower as set forth herein. The first loan draw generally occurs approximately 60 days after escrow upon completion and execution of all loan documents and other related agreements. |

Mighty Argo Mill, Idaho Springs, CO – 07312020
Summary of Terms and Conditions for Construction Loan Facility
Page 2 of 10

| | |
|---|---|
| **Interest Rate:** | An Applicable Pay Rate at a fixed rate equal to six and one-half percent (6.50%) interest only per annum. Such interest shall be payable as follows: (i) interest at the "Applicable Pay Rate," as defined above, shall be paid at loan closing into the Reserves Account as estimated from the Lender Approved Development Budget, and (ii) on the maturity date, the entire outstanding principal balance hereof shall be due and payable in full. |
| **Initial Term:** | Initial term thirty-six (36) months with two (2) 1 Year extensions |
| **Extension Options:** | Two (2) twelve (12) month extensions available contingent upon the following options: |

*First Extension Option*
1. 60-day notice to the Lender
2. Payment of a 50 basis point Extension Fee.
4. The Borrower will commence amortization payments based on a 20 year schedule.
5. The Borrower is not in default
6. Construction must be complete.

*Second Extension Option*
1. 60-day notice to the Lender.
2. Payment of a 50 basis point Extension Fee.
4. The Borrower will continue amortization payments based on a 20 year schedule.
5. The Borrower is not in default.

| | |
|---|---|
| **Repayment/Amortization:** | During the initial term, the Facility will be interest only, with principal due at maturity, except during the extension periods where the Facility will commence amortization payments based on a 20 year amortization schedule. Interest will be payable monthly, computed on an actual / 360-day basis. |
| **Origination Fee:** | Two percent (2.00%) of the Final Loan Amount, including any Preferred Equity Amounts as listed at time of close of escrow. |
| **Broker Fee:** | $370,000.00 paid to CAC as a breakup fee. The Lender will not fund any broker fee above one percent (1%) from the loan proceeds in any case. |
| **Minimum Interest:** | Lender shall earn a minimum of twenty four (24) months of interest payments. In the event, Borrower desires to refinance the loan before the twenty fourth month minimum, lender shall earn interest as if the loan had been extended for twenty four months. |
| **Collateral:** | The Facility will be secured by the following: |

1. First priority perfected deed of trust on the Property including all the three parcels of land that MACC is acquiring at Argo Station and all MACC improvements, Lender and Borrower agree to study creating a boundary survey that will encompass the improvements at Argo Landing that will be the subject of any improvements under the loan , except for any interest in the bike/trail system owned by the City of Idaho Springs, and any real property related thereto;
2. First priority perfected assignment of rents, leases, service, operating, management contract, permits, escrow accounts, warranties and other contract and agreements;
3. First priority perfected assignment of General Contractor's Contract, Architect's Contract and other contracts customarily provided in the

Mighty Argo Mill, Idaho Springs, CO – 07312020
Summary of Terms and Conditions for Construction Loan Facility
Page 3 of 10

          course of construction.

4.  First priority perfected lien security interest in all of the furnishings, fixtures, equipment, improvements and other articles of personal property used or useful in connection with the operation use and occupancy of the Project; and

5.  Assignment of interest rate hedge agreement, if applicable.

6.  Other documents deemed necessary by Lender.

7.  No secondary liens, pledges or mortgages will be permitted without the prior written consent of Lender.

**Reserve Accounts:** Lender will require that certain Loan funds be allocated in Reserves (withheld at closing and as reflected in the sources and uses) and used to cover specific expenditures including but not limited to: Loan Interest, Taxes, Insurance, Payroll, Construction & Soft Contingencies, Lease-up deficit and Capital Reserve accounts as may be required in amounts to be determined by and between Borrower and Lender, with the final decision regarding reserve amounts being the sole discretion of the Lender. No interest expense will accrue on the Reserves until (and to the extent) they are drawn.

**Construction:** Lender will require Borrower to deliver Construction Loan draw applications using AIA Form G702(or similar) on a monthly basis during construction and through startup of operations for a period continuing until the Project is operating in a stabilized manner or until such time all loan funds from Lender have been drawn, for Lender review, approval and disbursement of funds to Borrower. Lender shall retain the sole and exclusive right to reject, dispute, renegotiate and approve all Construction and Operation loan draws submitted by Borrower, such approval/rejection shall be commercially reasonable.

**Completion Guaranty:** Borrower to coordinate completion guarantees with the general contractors.

**Bonding & Insurance:** Borrower, along with General Contractor(s), Construction Managers (both at risk and not at risk) will pay for all necessary General Liability, Builders Risk and other such coverages as deemed reasonably necessary by Lender using Lender's Insurance Provider under Lender's OCIP program. Borrower will cause General Contractor(s), Construction Managers (both at risk and not at risk) and subcontractors, to bond the construction for the full value of the Lender Approved Construction Budget as provided by the approved General Contractor, or other Contractor.

**Construction Observation:** Lender will require monthly site visits for independent inspection of the property and construction during the loan term. Borrower will be required to include in the development budget an amount of $60,000.00 per year (anticipated @ $60,000 for 1 year) for Lender's site personnel.

**Operating Requirements:** Borrower shall provide sufficient staff in the operating company to operate profitably as soon as reasonably practicable. Borrowers shall employ, at a minimum, a qualified property management company and/or direct hire management staff, which may be made up of Borrower's existing personnel that will handle start-up and on-going operations to ensure profitable operation of the Property.

**Limited Recourse:** Borrower and Guarantor(s) shall be jointly and severally liable for all costs, losses, liabilities and expenses incurred by Lender in connection with certain limited "bad boy" and environmental carve outs, and for repayment of the Loan in full in the case of specified prohibited actions, to be negotiated with Borrower.

| | |
|---|---|
| **Guarantor(s):** | Borrower (and/or others, as determined by Lender during Underwriting). The Guarantor(s) will be required to execute a Guaranty Agreement re: the Non-Recourse Carve-outs. No Personal Guarantees will be required. |
| **Environmental Indemnity:** | Borrower and Guarantors will provide Lender with a full Environmental Indemnity. The Facility is subject to an environmental assessment acceptable to Lender. Borrower and Guarantors will indemnify and hold Lender harmless from all liability and costs relating to the environmental condition of the Project and the presence thereon of hazardous materials. |
| **Expense Deposit:** | A deposit ("Initial Deposit") of Thirty Thousand Dollars ($30,000.00), to cover expenses regarding legal, underwriting, travel, meals and lodging. All expenses incurred by TCG must be paid by Borrower including loan production, appraisal(s), market reports, environmental, geo-tech and other reports or expenses as required to provide the Loan. TCG will present all expenses ("Additional Deposit") beyond the Initial Deposit to Borrower for payment prior to ordering such report or services. If the Additional Deposit is insufficient to pay any expense (a "Shortfall"), TCG will stop processing the loan until Borrower pays TCG the Shortfall. If at any time TCG denies this loan, any unused portion of the Deposit(s) may be refunded to the Borrower, less a non-refundable $25,000 processing fee. Any unpaid and outstanding expenses will be debited from the loan at closing of the loan, at such time when loan closes. Should the Borrower execute this agreement and fund the cash escrow on or before August 21, 2020, Lender has agreed to initially waive the Expense Deposit. |
| **Security:** | The Loan shall be evidenced by a promissory note of Borrower which shall be secured by: (i) a 1st deed of trust; (ii) the Guaranties, if any; and (iv) such other security as may be reasonably required by Lender. |
| **Right of First Offer / Right of First Refusal:** | Borrower and Guarantor hereby grant to Lender an exclusive right to provide any follow on, future phases, or refinancing of the loan. In making this statement, Lender desires opportunity to refinance the property but would only be able to offer terms comparable to the market and mutually acceptable to Lender and Borrower at the time of such refinance. |
| **Financial Reporting Requirements:** | Monthly and annual reporting to be required, with more detailed requirements to be specified in the loan documents. |
| **Breakup Fee:** | Upon the Borrower's acceptance of this letter and for so long as Lender is acting in good faith toward a closing of the Loan (the "Transaction Period"), Borrower agrees to work in good faith to close the Loan. If at any time during the Transaction Period, including the condition that Borrower must contribute the Cash Equity to Lender's Escrow Account, if required, upon terms substantially in accordance with the term sheet, and Borrower or any of their respective affiliates (i) obtains or attempts to obtain financing (debt, preferred equity, PACE, EB-5, bonds or other non-equity types of financing herein referenced as "Financing") which may be an alternative to the Loan contemplated herein, (ii) accepts an alternative Financing in the form of a proposal, agreement, term sheet or commitment from another party which would eliminate Borrowers need for the Loan, (iii) notifies Lender that it intends to proceed with alternative Financing in lieu of the Loan; (iv) makes a material misrepresentation to Lender, (v) executes a contract to sell the Property to another or related party, then Borrower shall be jointly and severally liable for, immediately due and payable a three percent (3.00%) fee calculated by multiplying the fee times the total Financing to be provided by Lender (the "Break-up Fee") in addition to all costs and expenses associated |

Mighty Argo Mill, Idaho Springs, CO – 07312020
Summary of Terms and Conditions for Construction Loan Facility
Page 5 of 10

with collection of the Break-up Fee.

BORROWER ACKNOWLEDGES THAT THE DAMAGES TO LENDER ARISING FROM A BREACH BY THE BORROWER OF THE FOREGOING PROVISIONS ARE DIFFICULT AND IMPRACTICAL TO ASCERTAIN AS OF THE DATE OF THIS LETTER AND THAT THE AMOUNT OF THE BREAK UP FEE IS A REASONABLE ESTIMATE THEREOF AS LIQUIDATED DAMAGES.

**Syndication:** TCG will underwrite the full Facility amount but retain the ability to syndicate a portion of the subject Facility to participating financial institutions, solely at Lender's discretion. TCG will remain majority or lead Lender in any and all cases.

**Subordinate Financing:** On a case-by-case basis

**Other Terms:** This Summary of Terms and Conditions is not intended to be and should not be construed as an attempt to establish all of the terms and conditions relating to the proposed Facilities. It is not intended to preclude negotiations within the general scope of these terms and conditions. The loan documents containing final terms and conditions will be subject to approval by Borrower.

**Expiration of Term Sheet:** This Term Sheet shall be deemed null and void if an executed copy, along with the required Expense Deposit specified herein, is not delivered to Lender by 12:00 PM CST on August 9, 2020.

**Commitment:** Borrower understands and agrees that this term sheet is provided as a condition to lend, upon receipt of acceptable collateral in the form of security, as defined above, delivered to Lender. Lender may withdraw from such discussions at any time and for any reason in Lender's sole and absolute discretion, in which case all Cash Equity funds provided hereunder by Borrower shall be immediately returned to Borrower. Borrower further understands and agrees that Lender is not obligated to enter into the transaction contemplated by this Conditional Commitment, on the terms set forth herein or on any other terms, unless and until Borrower executes and delivers final documentation and acceptable collateral (in lenders sole and absolute discretion), the terms of which shall supersede in their entirety the terms set forth herein. Notwithstanding the foregoing, Borrower hereby acknowledges and agrees that Borrower's obligations to reimburse Lender for all Loan Expenses, as set forth in section "*Expense Deposit*" above, shall be binding upon Borrower and Guarantor.

**DEFINITIONS:** **DSCR:** NOI divided by Imputed Debt Service – 1.25 DSCR reviewed quarterly with an annual look back.

**Interest-Only Coverage Ratio:** NOI divided by Actual Interest Expense.

**NOI:** Shall be determined based on actual revenues from a rolling 12-month schedule, less operating expenses for the same period (excluding taxes & insurance expenses), annualized, less reserves and management fees equal to the greater of actual or 4% of the Effective Gross Income, less annualized taxes and insurance (utilizing most recent tax & insurance property bills from similar properties, verified by Lender).

**Imputed Debt Service:** The debt service shall be calculated utilizing the committed loan amount and the parameters of a typical permanent mortgage (30-year amortization and an interest rate equal to the rate listed herein).

Mighty Argo Mill, Idaho Springs, CO – 07312020
Summary of Terms and Conditions for Construction Loan Facility
Page 6 of 10

**Actual Interest Expense:** The actual debt service incurred for the Borrower from a rolling 12-month schedule, annualized.

**OTHER COVENANTS:**

1. No subordinate debt will be allowed on the Project, without the approval of the Lender, except for customary payables and any Metro District proceeds generated by the Project..
2. The Project must be 100% owned by the Borrower or its affiliates. Borrower's organizational structure must be acceptable to Lender
3. The Facility will be due and payable in full upon sale, or transfer of the Project or ownership of the Project, excepting condominium unit sales.
4. No Borrower distributions will be allowed unless:
   o Project achieves and maintains a minimum DSCR of 1.25;
   o Subject Facility is not currently in default (uncured), nor has it been in default for any period during the last 2 consecutive quarters.
5. **Events of Default:** Usual and customary for a Facility of this nature, including but not limited to:
   a. Default of payment of principal, interest, or any other obligation
   b. Violation of any financial or other covenants listed in this Term Sheet
   c. Change of Control of the Project or the Borrower
   d. Default in performance
   e. Breaches of Representations and Warranties: Those customary for a construction loan and others appropriate in the judgment of the Lender, including, but not limited to, no material adverse change, corporate and governmental authority and approval, organization, enforceability, financial reporting, compliance with laws and agreements, no material litigation, payment of taxes, full disclosure, and solvency.
   f. Voluntary or involuntary bankruptcy by Borrower or Guarantor.

**CONDITIONS TO APPROVAL:**

1. **LTC/LTV** requirements, as listed in the Facility section of this letter.
2. **Equity:** All required equity shall be contributed in whole before any loan proceeds are funded, acceptable to Lender.
3. **Liquidity and Net Worth Verification:** All documentation necessary and acceptable to Lender that verifies liquidity and net worth amounts of Guarantors shall be provided to the Lender.
4. **Guarantor Financials:** Guarantors must deliver current and acceptable financial statements to the Lender.
5. **Appraisal:** A FIRREA-conforming appraisal performed by the Lender approved MAI appraiser that is satisfactory to the Lender must be received prior to closing and must support a loan as per the requirements in the Facility section of this letter. The appraisal shall demonstrate verification of revenue and expense levels satisfactory to Lender.
6. **Market Analysis Report:** Report from a recognized market analyst acceptable to Lender.
7. **Soil Report:** Report(s) from a licensed geotechnical engineer acceptable to Lender, shall be provided for the subject Project.
8. **Environmental Reports:** Report(s) acceptable to the Lender, shall be provided for the subject Project.
9. **Environmental Indemnity:** The Borrower/Guarantors shall

Mighty Argo Mill, Idaho Springs, CO – 07312020
Summary of Terms and Conditions for Construction Loan Facility
Page 7 of 10

indemnify, pay and hold harmless the Lenders against any loss, liability, cost, or expense incurred in respect to the financing completed hereby, the use or proposed used of the proceeds hereof or any loss incurred as a result of environmental issues.

10. **Title Insurance,** Borrower shall provide acceptable Mortgagee Title Insurance for the Project from a title company acceptable to the Lender.

11. **ALTA Survey,** Borrower shall provide the Lender with a current survey in form and content acceptable to the Lender.

12. **Property Insurance** shall be provided on the Project in a fashion acceptable to Lender, as outlined above, and/or its designated consultant, for public liability, flood (if required), builder's risk, fire & casualty and in some instances, insurance to cover acts of terrorism, with the Lender named as Lender Loss Payable, Mortgagee and additional insured, as applicable.

13. **Inspecting Architect**: Lender shall require a review and approval of the Project plans and specifications, and monthly reports from an inspecting architect engaged by the Lender, certifying work completed to date and verifying that remaining loan funds are sufficient to complete the Project in accordance with the plans and specifications.

14. **Project Cost Budget** must be satisfactory and acceptable to Lender.

15. **General Contractor** or entity providing the fixed cost construction contract must either be bonded or be bondable, as well as major subcontractors deemed necessary by Lender, in each case acceptable by Lender.

16. **Developer/Construction Management Fees** will be paid out proportionately in relation to the percent of completion of the Project, or as otherwise agreed by the parties.

17. **Construction/Improvement Disbursements** shall be made no more than once a month. The first disbursement will occur thirty days after closing per agreed cashflow schedule prepared by Borrower and accepted by Lender. Each disbursement shall be made through a title company and/or directly by the Lender and accompanied by construction contracts, sworn statements, lien waivers and other documents required by the Lender and/or the title company to assure proper title insurance coverage.

18. **USA Patriot Act**: As required by the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001), Lender hereby notifies the Borrower that pursuant to the requirements of the Act, and the Lender's policies and practices, the Lender is required to obtain, verify and record certain information and documentation that identifies the Borrower, which information includes the name and address of the Borrower and such other information that will allow the Lender to identify the Borrower in accordance with the Act.

19. **Advertising**: The Lender will have the right to publicly announce that the Lender has made and closed the Loan, at the Lender's cost along with placing signage on the property or being placed on developer's signage, as the case may be.

20. **Depository Relationship/Lockbox Account/Escrows** for the Property shall be maintained by the Lender.

21. **Interest Rate Protection** – Not Required

22. **Expenses**: In addition, the Borrower agrees to pay all out of pocket expenses incurred by the Lender during the due diligence, issuance, closing and administration process of the Facility including, but not limited to appraisal reports, environmental reports, legal fees, documentation, title work (including insurance), survey, filing fees,

Mighty Argo Mill, Idaho Springs, CO – 07312020
Summary of Terms and Conditions for Construction Loan Facility
Page 8 of 10

reasonable syndication costs, and any other costs typical for a transaction of this type; these fees will be due and payable by the Borrower, whether or not the transaction is completed, indifferent to the faulted party. These fees are reflected in the sources and uses.

23. **Documentation**: The Facility shall be closed on documents prepared by Lender's counsel. The Lender and its counsel shall approve all loan and related documents. The Borrower will also provide the Lender with the Organizational chart of Borrower, a copy of executed ownership documents and any other company documents that are required by the Lender.

24. **Cash Equity Escrow**: All Cash Equity required shall be placed in escrow prior to start of loan documentation. Borrower expressly authorizes Lender at its option to instruct Escrow Agent to place escrow funds in an interest bearing or other investment account provided funds are not commingled with other funds or otherwise transferred out of any such account. Any interest earned on the escrow funds shall be credited to the account of Borrower.

**Confidentiality & Non-Circumvent:**

This Term Sheet is delivered to the Borrower on the condition that these terms be kept confidential and not to be made public, shown to, or discussed with, any third party (other than on a confidential or need-to-know basis with the Borrower's directors, officers, members, employees, counsel and other advisors, or as required by law) without TCG's prior approval. Furthermore, without the prior written permission of Lender, Borrower agrees to hold in confidence the names of and under any circumstance not to make any contact with, engage in any negotiations with, or otherwise be involved in any transaction with any attorney, banking or lending institution, trust, insurance company, corporation or individual, lender or borrower, buyer or seller, introduced to Borrower by Lender; such being confidential and proprietary in nature. The Borrower's obligations under this paragraph are binding and shall survive any termination of this letter, except that upon the execution of the further Loan Agreements the terms of such agreements shall supersede these provisions.

**Counterparts/Fax & Electronic Signatures:**

This Term Sheet may be executed in any number of counterparts, each of which shall be treated as an original, but all of which, collectively, shall constitute a single instrument. This Term Sheet may be executed and delivered by facsimile transmission or electronic mail (i.e., ".pdf"), and an executed copy of this Term Sheet delivered by facsimile transmission or electronic mail shall be deemed to be an original counterpart for all purposes.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

Mighty Argo Mill, Idaho Springs, CO – 07312020
Summary of Terms and Conditions for Construction Loan Facility
Page 9 of 10

The undersigned herby agree to the terms and condition set forth above.

**BORROWER:**
Mighty Argo Cable Car, LLC
a Colorado limited liability company

By: _Mary Jane Loevlie_

Name: Mary Jane Loevlie    -   8-9-2020

Title:Manager

Mighty Argo Mill, Idaho Springs, CO – 07312020
Summary of Terms and Conditions for Construction Loan Facility
Page 10 of 10

## APPROVED LOAN SOURCES AND USES

| Sources | | |
|---|---|---|
| Senior Debt | 84% | $32,372,000 |
| LP Equity Contribution | 14% | $5,200,000 |
| GP (Sponsor) Equity Contribution | 2% | $800,000 |
| Total Sources: | 100% $ | 38,372,000 |

| Acquisition and Improvement Budget | | |
|---|---|---|
| Land and Artifacts Acquisition | $ | 800,000 |
| Total Acquisition | $ | 800,000 |
| Hard Costs | $ | 28,392,292 |
| Total Hard Costs | $ | 28,392,292 |
| Predevelopment Costs | $ | 541,084 |
| Architecture & Engineering | $ | 1,842,394 |
| Legal (Project) | $ | 250,000 |
| Legal (Lender and Borrower) | $ | 120,000 |
| Insurance | $ | 138,836 |
| Marketing | $ | 100,000 |
| GeoTech | $ | 77,549 |
| Environmental | $ | 60,000 |
| Developer Fee | 4.00% $ | 1,135,692 |
| Consultants/Management | $ | 358,931 |
| Permits | $ | 200,000 |
| Third Party Reports | $ | 30,000 |
| Real Estate Tax Reserve | $ | 50,000 |
| Misc. Soft Costs | $ | 100,000 |
| Lender Origination | 2.00% $ | 638,666 |
| Lender Oversite Fee (1 year) | $ | 60,000 |
| Closing Costs | 0.30% $ | 116,000 |
| Hard and Soft Cost Contingency | 5.00% $ | 1,796,830 |
| Cable Car Contingency | $ | 200,000 |
| Broker Fee | $ | 370,000 |
| | $ | 8,185,981 |
| Construction Interest Reserve (12 Months) | 6.50% $ | 993,727 |
| Total Uses | $ | 38,372,000 |